Clealon MANN, Plaintiff and Appellant,

v.

AMERICAN WESTERN LIFE INSURANCE COMPANY, Defendant and Respondent.

No. 15506.

Supreme Court of Utah.

Oct. 26, 1978.

Robert J. De Bry and Valden P. Livingston, Salt Lake City, for plaintiff and appellant.

F. S. Prince, Jr. and Randy L. Dryer of Prince, Yeates & Geldzahler, Salt Lake City, for defendant and respondent.

MAUGHAN, Justice:

Appeal from directed verdict or summary disposition of claims for damages arising out of alleged wrongful termination of agency relationship between appellant and respondent insurance company. Appellant asserts three theories of action, tort, breach of contract, and restitution. We affirm, and award costs to respondent.

This action grows out of the termination of a contract under which appellant acted as an insurance sales agent for respondent, hereafter American. The written instrument appellant, hereafter Mann, concedes to be the foundation of the agency relationship provides for termination by either party on thirty days written notice to the other. It further defines Mann's right to participate in premiums paid after termination, limiting that right to certain renewal premiums. It is not disputed American is paying Mann commissions on renewal premiums as the contract's termination clause provides.

Throughout the period relevant to this litigation, American and a partnership known as "AIM" maintained a "general agency" relationship under a written contract which provided more generous commissions to AIM than Mann's contract provided for him. Moreover, the AIM contract did not treat the subject of its termination, and arguably AIM's right to share in premiums attributable to its sales or the sales of agents it recruited could not be diminished by termination or otherwise.

Mann claims (1) American terminated its agency contract with him in bad faith and should respond in damages for that tortious conduct, (2) the written contract between the parties was orally modified to conform with the AIM contract, and American should be ordered to pay commissions to Mann accordingly, (3) American has been unjustly enriched at Mann's expense and should be ordered to disgorge its unconscionable profit under equity doctrines of restitution.

The evidence shows Mann last signed an agency contract with American in 1971. In May of 1973, he became a salaried "Director of Agencies" for American, but submitted a formal letter of resignation from that position in September of that year. No written notice of termination of the 1971 agency agreement had ever been given as that agreement contemplates, and Mann resumed sales and agent recruitment activity for American. He again shared in the premiums attributable to his sales and the sales of agents recruited by him or by his recruitees. His status was different from his presalaried status in the respects that American provided him an office in consideration for consultant services, and began to refer to him as a "general agent." Nevertheless, Mann concedes the 1971 contract survived the Director of Agencies episode, and remained the foundation of the parties' relationship. The court was not asked to construct an implied agreement from the parties' conduct.

The evidence further shows Mann undertook to negotiate an improved agency agreement, and there were conversations on the subject between him and American's then president, Mr. Matheson, in early 1974. On July 16, 1974, Matheson wrote appellant the following memorandum:

1. We are amenable to your appointment as a general agent for the Company. If you wish to submit a proposed agents contract, we would be happy to review it with you. We could approach this either on the basis of a non-exclusive, managing general agent as defined in the Utah Insurance Code, or as an exclusive, general agent for us. The commission scale would depend upon the exact nature

of our relationship, but in no event would we exceed a 100 percent commission on first year business. As a general agent you would be responsible for all of your own agency expenses including office rental, secretarial help, telephone, postage, etc. As to office space, we could possibly continue to make space available for you here at a specified rental. Should you elect to enter into a general agency relationship with us, we would consider transferring the agents which you have recruited directly for the Company to this date to such agency under your exclusive control with the agents consent. However, since these agents were recruited while you were a division manager for the Company, the maximum commission schedule in relation to the business produced by said agents would continue at the present 94 percent maximum.

We are also amenable to continuing our present relationship with you as a division manager direct with the Company at a 94 percent commission rate. In consideration for special services in relation to conservation, product development, and general agency consultant, we will continue to furnish an office here at no expense to you. Your continued relationship with the Company under AIM's supervision is, of course, for you to determine with AIM subject to our ultimate review pursuant to your agents contract with us.

Mann made no written response to the memo. His evidence that his agency agreement was orally modified to conform with the AIM contract consists entirely of his following testimony about his conversations on January 3, 1975, with Mr. Matheson:

Q. Tell the jury what was said by the parties on that occasion.

A. Mr. Matheson had written down on paper a proposed general agent's contract, starting at 94% and, based on volume, working up to 100%. I told Frank that was not acceptable at that time, that I wanted a contract just like AIM's.

Q. And who is AIM?

A. American International Marketing. And he agreed that he would give me a contract—he could not give me one just like AIM's because of the conflict with the 5%. He agreed to give me 100% and make some concessions for the other 5%. And that's Item No. 2, which, as it says in his notes, "concessions to his agency," he would advance my agents on submit business and he would advance the managers' overrides as a concession.

Q. Anything else said during the meeting?

A. Yes. We discussed a 1% office allowance. We talked about the straight commission on my 988 account, and he was worried about that balance. So was I. He wanted that worked off.

\* \* \* \* \* \*

Q. Anything else said?

A. Yes, He indicated that, for me to receive a general agent's contract, that I would have to vacate the office space at the home office.

\* \* \* \* \* \*

Q. Do you remember anything about the meeting?

A. Only that in his notes he says, "Cleal-on will consider."

\* \* \* \* \* \*

Q. Okay, now, was any conclusion reached?

A. No.

Q. What was—

A. I said that I would think it over and that afternoon I stuck my head in the door and said, "Frank, we have got a deal. I will move next door. We can arrange for the rental of the office space."

In the spring of 1976, new management for American was installed after a stock acquisition takeover. On August 6, 1976, appellant was given thirty-day notice of termination of the agency agreement.

■ Since the matter was the subject of directed verdict at the trial level, we are obliged to view the evidence in the light most favorable to appellant. To uphold the

**464**

directed verdict, we must first concur that, even if a jury believed Mann's testimony and discredited American's, it could not, in the proper exercise of jury function, find the parties substituted the AIM contract for their 1971 agreement as the basis of their relationship. Reviewing appellant's testimony reproduced above, we cannot conceive that reasonable jurors could construe the conversations as reported to constitute a cancellation or modification of American's rights, with respect to termination afforded by the 1971 agreement. The subject did not even arise in the course of conversation. A jury could very well find modification was effected, as to the provisions which were discussed, but not as to provisions which were ignored. The nature of an agent's right to share in premiums after agency termination is (as this suit demonstrates) an element of major consequence in agency contracts. The notion that American intended, by Mr. Matheson's statements as reported, to magnify that right as enormously as Mann's complaint suggests is not a notion reasonable minds could entertain. We hold, then, that directed verdict on Mann's contract claim was properly and correctly entered.

Mann's next claim is for damages flowing from American's having terminated the agency agreement in "bad faith." Here again, to affirm the trial court, we must assume a jury would believe Mann's evidence and we must nevertheless concur that a jury could not make findings to sustain a verdict. The trial court concluded the 1971 agency agreement was the operative instrument on the date of agency termination, and we have affirmed. The agreement specifically provides the agency may be terminated by either party on thirty days written notice to the other and how premiums paid after termination will be paid. There is no contractual requirement that a terminating party express or have good cause for termination.

Mann cites substantial authority for the proposition that, even though a party to a contract may have a right to terminate it without cause, he must nevertheless exercise the right in good faith and not at a time or in a manner which inflicts unnecessary injury or works unconscionable injustice.

Courts have permitted considerations of equity to control over clear contract language covering termination where, for example, a dealer franchise agreement was terminated after the dealer had invested heavily in showroom facilities and parts inventory (*deTreville v. Outboard Marine Corp.,* 4th Cir., 439 F.2d 1099), where an employee was terminated just before a bonus was payable which he had fully earned except for completing a minimum employment period (*Coleman v. Greybar Electric Co.,* 5th Cir., 195 F.2d 374), where the threat of termination was used to discourage the plaintiff and others from asserting workmen's compensation rights (*Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425), and with respect to adhesion contracts. A variety of tort and contract theories have been contrived to permit recovery in these situations, and the "duty of good faith" theory which Mann advances is among them.

■ Whatever the justification for judicial remaking of the parties' contracts in these extreme cases may have been, it cannot be adopted as a general precept of contract law that, whenever one party to a contract can show injury flowing from the exercise of a contract right by the other, a basis for relief will be somehow devised by the courts.

In this case, the equities in favor of Mann are hardly overwhelming. The contract under which he operated for some fifteen years was productive for him. In 1974, he was invited to prepare and submit the kind of general agency agreement he wanted, and he declined to do so. He has not, as a result of the termination, ceased to share in premium production attributable to his past effort; he shares in that production in the manner his contract expressly contemplated.

In *Atkinson v. Equitable Life Assurance Society of the U. S.,* 519 F.2d 1112, the Fifth Circuit Court of Appeals considered a

fact situation very similar to the one before us, but where the equities more strongly favored the terminated insurance agent. Atkinson's contract was terminated after 13½ years of operation. Substantial renewal commissions on business he had written became vested, under his contract, after 15 years. In reversing judgment in Atkinson's favor, the court held the mere fact of termination when the investment was nine-tenths earned would not support a judgment. Here, we have in the record Mann's full presentation on the issue of bad faith. It consists entirely of evidence of his satisfactory performance and the lack of good cause for termination.

This Court has previously demonstrated strong reluctance to rewrite contracts for litigants because the consequences of enforcement of the contracts they signed seem unfair.[1] Nothing about the circumstances of this case can overcome that reluctance. It is unnecessary for us, in the context of this case, to announce that the exercise of a contract right in bad faith is or is not actionable. We merely concur the evidence in this case was not sufficient to justify the submission of any bad faith issue to a jury.

The restitution claim asserted by Mann is easily put to rest. Recovery in quasi contract is not available where there is an express contract covering the subject matter of the litigation.

ELLETT, C. J., and CROCKETT, WILKINS and HALL, JJ., concur.

---

1. *Bullock v. Deseret Dodge Truck Center,* 11 Utah 2d 1, 354 P.2d 559.