**TED R. BROWN AND ASSOCIATES, INC., Plaintiff and Respondent and Cross-Appellant,**

v.

**CARNES CORPORATION, a corporation, and Long Deming Utah, Inc., a corporation, Defendants and Appellants and Cross-Respondents.**

No. 860182–CA.

Court of Appeals of Utah.

April 11, 1988.

Joseph J. Palmer, Reid E. Lewis (argued), Jeffrey Robinson, Moyle & Draper, Salt Lake City, for defendants and appellants and cross-respondents.

Robert S. Howell, Michael F. Jones, Jeffrey R. Oritt (argued), Tibbals, Howell & Jones, Salt Lake City, for plaintiff and respondent and cross-appellant.

## OPINION

Before JACKSON, ORME and GREENWOOD, JJ.

JACKSON, Judge:

Carnes Corporation ("Carnes") appeals from a judgment awarding $20,000 in sales commissions and prejudgment interest from January 1, 1978 to Ted R. Brown and Associates, Inc. ("Brown").[1]  Brown cross-

appeals, seeking two additional types of commissions and prejudgment interest from January 1, 1972.  We reverse the judgment of the trial court.

On May 24, 1961, the parties entered into a written sales agreement in which Brown was granted an exclusive territory (all of Utah and portions of Idaho and Wyoming) in which to solicit—strictly on a commission basis—orders for sales of Carnes's ventilation equipment.  Pursuant to the explicit terms in addendum 3 of that agreement, Brown was potentially entitled to three different types of commission (alternately called "credits" in the agreement) on a sale of equipment: a specification credit if Brown obtained specification of Carnes's equipment in construction plans within its territory; an approval (or order) credit if purchase of Carnes's equipment was approved by a project architect or engineer in Brown's territory; and a territorial credit if Carnes's equipment was ordered elsewhere but shipped into Brown's territory.  A formula was prescribed for allocating these credits among sales representatives from other territories who became involved in a single transaction.  The credits were due and payable the month after Carnes received full payment for the material purchased.

With regard to the termination of the agreement by either party and the payment of commissions in the event of termination, addendum 4 to the sales agreement provided:

> Either party shall have the right to terminate this agreement, by giving the other party thirty (30) days notice in writing of his intention so to do, and in the event of such termination, rights granted by this agreement shall terminate.  If termination notice be given by Carnes, distributor or representative shall upon receipt discontinue all bidding activity on the products covered by this agreement and immediately furnish a copy of all active quotations dated prior to this cancellation notification for Carnes'[s] records.  Any

---

1. This action was filed in 1973.  The issue of personal jurisdiction over Carnes, a Wisconsin corporation, was before the Utah Supreme Court twice, in *Ted R. Brown and Assocs., Inc. v. Carnes Corp.,* 547 P.2d 206 (Utah 1976) and 611 P.2d 378 (Utah 1980).  The judgment appealed from herein was entered December 17, 1985.

such quotations which develop into accepted orders within 30 days from the date notice is so given by Carnes shall entitle the distributor or representative to resale discounts at the same rate and upon the same terms as though this agreement had continued in effect.

If terminated under this provision, Brown was not entitled to any type of sales credit unless Carnes's equipment was specified, approved and ordered within thirty days of the termination notice.

The Church of Jesus Christ of Latter-Day Saints ("Church") began planning a multi-story administrative office building in Salt Lake City during the early 1960's. Beginning in 1963, Ted Brown, the owner of Ted Brown and Associates, Inc., expended considerable time and effort to have Carnes's equipment specified in the Church's construction plans. As Carnes's exclusive Utah sales representative, he consulted repeatedly with the Salt Lake City architect and engineer who planned the structure and with Bridgers & Paxton, the associate mechanical engineers based in Albuquerque, New Mexico. He and his staff traveled to Carnes's Wisconsin headquarters to advance their mutual cause. He rented building space in Salt Lake City and presented customized samples of Carnes's equipment for examination by the architect, the engineers, and Church officials in order to help insure Carnes's selection as the ventilation equipment supplier.

On June 2, 1965, Ted Brown sent the following letter to Dan Nevaiser, Carnes's national sales manager:

The samples that were charged partially to us for the

L.D.S. CHURCH OFFICE BLDG.

job were used to seek specification for Carnes products for that job. Having done as much as we have with Bridgers & Paxton, and with the architect, who is located in Salt Lake, and who is really the ultimate specifying agent, we are reluctant to accept the idea that a specification split with the representative in Albuquerque should be made at the time of the sale.

We would like to have a letter from you in our file confirming our idea that we should get specification credit as well as territory and order credit for the L.D.S. Church Office Building when it is finalized. The fact that Bridgers & Paxton has their home office in Albuquerque does not seem to justify a split on specification with the Albuquerque representative for this job.

Kenneth Watts, Carnes's western regional sales manager in California, responded in a letter to Ted Brown that recognized Brown's efforts but emphasized that Carnes's New Mexico representative had also done considerable work with Bridgers & Paxton on the Church office building over the previous three or four years. Because of this, Watts concluded, it was only fair that Brown split the specification credit with Carnes's Albuquerque representative. Notwithstanding Watts's position on the matter, Nevaiser sent the following message to Brown on June 15, 1965:

This is to state that you are to receive specification credit as well as territory and order credit for the Latter Day Saints Church office building when it is finalized.

There is no question in our mind that the specification originated in Salt Lake City, and although Bridgers & Paxton have their home office in Albuquerque, all of the activity that they have been involved in has been in your area.

You certainly deserve this order in its entirety.

By December of 1965, the specifications for the office building were still not finalized. The Church apparently put the project on hold from the fall of 1965 until early 1968. At that time, Carnes's Albuquerque representative, Johnston, requested Carnes's current price list for Bridgers & Paxton, which was anticipating the start of the project bidding process.

After receiving a copy of that inquiry letter, Ted Brown responded in a letter to Carnes on February 5, 1968 in which he reviewed his company's prior efforts in getting the project to the specification stage. He requested that his company be sent the

current prices so they could be passed on by him to the project architect and to Bridgers & Paxton, adding: "We would feel somewhat more than put upon if we anticipated a territory split with Johnston where he would tend to claim specification [credit]."

On August 29, 1968, Carnes's new national sales manager, Harry Griese, sent a letter to Brown terminating their May 24, 1961 sales agreement. Echoing the terms of the termination provision, Griese requested a copy of all active quotations dated prior to the cancellation letter, noting that only such quotations that developed into accepted orders within thirty days of the cancellation would entitle Brown to sales credits. Carnes entered into a new sales agreement in September with the firm of Long Deming Utah, Inc. ("Long Deming"), which took over Brown's former territory.[2]

Ted Brown's September 4 reply letter to Griese again reviewed in detail the time, money and effort Brown had spent on the Church project and expressed concern that Brown's investment could not be recovered within the contractual thirty-day period, especially in light of the fact that bidding on the project was not scheduled to begin until after January 1, 1969. Brown also provided a list of its orders that were still awaiting Carnes's approval and a list of its outstanding quotations which had not yet developed into orders; because the Church office building project had not yet moved to the quotation stage, it did not appear on either. The letter concluded:

> We have worked for, and we feel deserve credit for the work that has been done. This is particularly true if we no longer represent Carnes....
>
> We shall appreciate your immediate answer confirming commission protection on the above jobs, and particularly the L.D.S. Office Building.

Griese responded on September 10, 1968:

> According to the terms of our contract, your commission claims would end on

any job not already quoted. However, because of the important work done on this very attractive piece of business, we have agreed to make an exception. I discussed this matter briefly with Wills Long [of Long Deming Utah, Inc.] and he agreed that there should be an equitable settlement made if we are awarded the contract.

> Ted, since the job has not been bid, you would have no claim on either the order or job site credit. We do believe that you should receive some commission credit on the specifications. Based on the work already done and the position of [project engineer] Tregeagle and the L.D.S. Headquarters in Salt Lake City, we would see to it that you receive half of the specification credit on this project. In other words, of a total of 40% commission for specification, 20% would go to Albuquerque for their work with Bridgers & Paxton, while the other 20% would go to your operation.

> This commitment is based on the project being bid and a contract awarded to a General Contractor by March 1, 1969. Should the General Contract award be delayed beyond March 1, 1969, commission paid to you for specification credit would have to be worked out between you and Long Deming Utah.

Three months later, on December 13, Ted Brown wrote to Griese again, complaining about the 50/50 split of the specification credit with the Albuquerque representative and stating:

> We also consider the award date limitation in your letter and overall credit as quite restrictive in view of the work done by us.

> Present plans for the building are to have bid documents out in January for bidding.

> We would appreciate your further review of the factors and consideration.

Griese's January 7, 1969 response letter refused to change or extend the terms set out in his letter of September 10, 1968.

---

**2.** Long Deming Utah, Inc.'s parent company had previously been Carnes's sales representative in Denver.

At some point after March 1, 1969 that cannot be determined from the record, Carnes's equipment was included in the final specifications released for bidding on the Church office building project. The contract was awarded, and the order was accepted by Carnes. Upon receipt of payment for the equipment, Carnes disbursed to Long Deming all of the approval and territorial credits and 80% of the specification credit. The remaining 20% of the specification credit was disbursed to Carnes's Albuquerque sales representative.

Brown filed this action in October of 1973 to recover the specification, approval and territorial credits on the Church office building project. An amended complaint was filed in early 1978. The first cause of action against Carnes was for wrongful termination of Brown, without just cause, resulting in its loss of $50,000 in sales credits on the "imminent" Church office building contract. Brown's second claim was for the specification credit paid by Carnes on the Church project. It is essentially a claim for breach of the parties' 1961 sales agreement, as modified by their subsequent understandings. The third claim alleged a willful and malicious conspiracy by Carnes and Long Deming to terminate Brown's sales agreement without cause and thereby deprive Brown of the $50,000 in sales commissions.

After a two-day bench trial, the trial judge concluded that the evidence did not support any finding of "conspiracy, fraud, willful, malicious or intentional [or] other improper conduct on the part of either Carnes or Long Deming with respect to the termination of the Sales Agreement." Brown's first and third causes of action were dismissed with prejudice. In its cross-appeal, Brown does not challenge this portion of the trial court's decision.

With regard to Brown's second cause of action, however, the trial judge concluded that Carnes had breached its "implied contractual duty to Brown to deal fairly and in good faith pursuant to and under the Contract with respect to the payment of the commission." For reasons which are less than clear, Brown was awarded a $20,000

judgment for the specification credit, calculated by the court to be 4% of the net amount of the equipment Carnes sold to the Church project. While appellant Carnes concedes it had an implied duty to perform its contractual obligations in good faith, it contends that the judgment erroneously imposed on Carnes a substantive term that is neither express nor implied in any contract of the parties. We agree.

On appeal, we review factual findings under the clearly erroneous standard, Utah R.Civ.P. 52(a), giving due regard to the trial judge's opportunity to assess witnesses' credibility. *Zions First Nat'l Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988). We apply the same standard to findings regarding the intentions of parties to an ambiguous or unintegrated contract that are based on evidence extrinsic to the contract itself. *Porter v. Groover*, 734 P.2d 464, 465 & n. 1 (Utah 1987); *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). However, questions of contract interpretation not requiring resort to extrinsic evidence are questions of law which we review for correctness. *Zions First Nat'l Bank*, 749 P.2d at 653; *Kimball*, 699 P.2d at 716.

The trial court determined that Carnes did not act improperly or unreasonably in terminating Brown pursuant to the express terms of their agreement, i.e., did not terminate Brown for the "bad faith" purpose of avoiding payment of Brown's commissions. In light of this, Brown's recovery of any commission on the Church project must be based on breach of a duty expressly or impliedly contained in a modification of the parties' 1961 written contract.

Parties to a contract may, by mutual consent, modify any or all of a contract, *Rapp v. Mountain States Tel. & Tel. Co.*, 606 P.2d 1189, 1191 (Utah 1980), even if the contract itself contains a provision to the contrary, *Provo City Corp. v. Nielson Scott Co.*, 603 P.2d 803, 806 (Utah 1979). However, where the modification is agreed upon, the terms thereof prevail over inconsistent terms in the original contract in governing the rights and obligations of the parties. *See Rapp*, 606 P.2d at 1191.

Where a party's expectations under a contract are frustrated, he may seek recovery from the other party only if his injury is the direct result of a breach of an agreed term of the contract as modified. *Id.* at 1191–92 & n. 5.

■ It was Brown's contention throughout the trial and in its cross-appeal that Ted Brown's letter of June 2, 1965 and Nevaiser's response letter of June 15, 1965 together constituted a new, enforceable agreement modifying the 1961 agreement. Although Brown's amended complaint alleged only that the parties' modification of the 1961 written agreement entitled it to the specification credit, under Brown's trial theory the modification terminated the commission payment restrictions found in addendum 4 of the original agreement, quoted above, and entitled Brown to payment of all three types of sales commissions on the Church office building "when it [was] finalized." Brown argued that this language in Nevaiser's letter meant that the sales commissions were payable regardless of whether Brown was still Carnes's sales representative when the Church contract was awarded and the order accepted by Carnes.

The trial court did not make findings about the explicit or implicit terms of the parties' contract as modified. However, it largely rejected Brown's trial theory in this regard because it only awarded Brown the specification credit paid on the Church project and not the approval and territorial credits mentioned in Brown's and Nevaiser's letters. Both letters are clearly addressed only to the issue of whether the sales commissions would be split with Carnes's Albuquerque representative when the Church's order was finalized. There is nothing in the correspondence from which it can be inferred that Brown's possible termination was even considered by Ted Brown or Nevaiser.

Nevaiser's deposition testimony, introduced at trial by Brown, confirms that Ted Brown had expressed concern in a conversation prior to his letter that he would have to share the specification credit with Albuquerque because Bridgers & Paxton was located there. Nevaiser admitted he had the authority to settle disputes over competing claims to sales commissions within the framework of sales representatives' contracts with Carnes. He also admitted that his letter was intended to amend the original contract, which would have required a commission split, but added that the exception he made

> goes with the contract, because when I refer to territory and order credit, it implies that he will be selling the product ... and that he was—would still be the sales representative in order to make that sale.

Although at trial Ted Brown characterized his June 2, 1965 letter as a request for all the sales credits regardless of when the job was finished, his 1968 response to the termination letter belies this reading of the earlier correspondence. He did not write to Griese and let him know that the original agreement had been modified by Nevaiser to exempt the Church project from the provision covering payment of commissions after termination by Carnes; instead, he detailed Brown's work over the years and asked for special consideration that would result in future commission protection on the Church project.

There is evidence from which the trial court could reasonably conclude that Nevaiser modified the original agreement with regard to the commission split between Brown and the Albuquerque representative if and when it became payable. But there is no evidence in the record from which the trial court could reasonably conclude that Nevaiser's June 15 letter contractually bound Carnes to pay Brown the specification credit on the Church project—but not the other two types of credits—whether or not Carnes had terminated Brown as sales representative when the Church contract was finally specified, bid, and awarded. *See Mann v. American W. Life Ins. Co.,* 586 P.2d 461, 464 (Utah 1978) (factfinder could find oral modification of contract only as to provisions actually discussed by parties, not those ignored).

In its findings and conclusions, the trial court repeatedly stressed that Brown had

expended considerable resources in order to get Carnes's equipment specified in the office building plans, a fact that Carnes recognized on several occasions. The court noted that Carnes recognized the "special circumstances" involved in the Church project, specifically referring to Nevaiser's June 15, 1965 letter and Griese's September 10, 1968 letter and that Carnes could have contracted with Long Deming in a way that would have allowed payment of the specification credit to Brown despite Brown's termination, but did not do so.

Significantly, there is a specific finding that Griese's agreement to pay part of the specification credit to Brown if the contract was awarded by March 1, 1969 was "unreasonable." The trial court's ensuing conclusion—i.e., that Carnes breached its implied contractual duty to Brown to "deal fairly and in good faith ... with respect to payment of the [specification] commission"—could only result from a finding that the parties had entered into a contract in which Carnes, through Griese, unconditionally promised to pay Brown an "equitable settlement" of its specification credit claim whenever the Church contract was finally bid and awarded.

There is, however, no evidence in the record to support a determination that Carnes made such an open-ended and unconditional promise of an "equitable settlement." Although these words were used in conjunction with Griese's discussion of the matter with Long Deming, Griese's September 10 letter unmistakably offered to disburse half of the specification credit to Brown *only* if the contract was awarded by March 1, 1969. It was not. This express limitation was ignored by the trial court.

In exercising its rights under this final modification of the parties' contract, Carnes's implied duty of good faith did not require it to keep extending the deadline *ad infinitum* until the Church contract was finally awarded.[3] "[W]here the parties have made an express contract, the court should not find a different one by 'implica-

tion' concerning the same subject matter if the evidence does not justify [such] an interference...." 3 *Corbin on Contracts* § 564 (1960). In other words, an express agreement or covenant relating to a specific contract right excludes the possibility of an implied covenant of a different or contradictory nature. *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980).

Ted Brown admitted that the termination provision in his 1961 agreement with Carnes was standard in contracts between manufacturers and their sales representatives, although the cut-off for commission payments was not invariably thirty days. Under the provision in addendum 4 to which Brown assented, Brown would reasonably expect that, if terminated by Carnes, it would lose commissions on any jobs that did not culminate in an order to Carnes within the agreed thirty days. During the lengthy planning stage of the Church office building project, Brown could have negotiated with Carnes to protect its entitlement to any or all of the sales credits on that special job regardless of whether its relationship with Carnes was terminated by the time its efforts came to fruition. There is no evidence that Brown attempted to do so until after Griese sent Brown the August 29, 1968 termination notice. Griese, recognizing Brown's efforts on the project specifications, agreed to pay Brown half the specification credit if the sale was final by March 1, 1969. Although Brown objected to that restriction and sought a longer extension, Griese would not agree to any.

It is fundamental that every contract imposes a duty on the parties to exercise their contractual rights and perform their contractual obligations reasonably and in good faith. *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 311 (Utah 1982); *Rio Algom Corp.*, 618 P.2d at 505. Nonetheless, a court may not make a better contract for the parties than they have made for themselves; furthermore, a court may not enforce asserted rights not supported by the contract itself. *See Rio Al-*

---

**3.** Carnes likewise had no implied "good faith" duty to contract with Long Deming for payment

of the specification credit to Brown whenever the deal finally closed.

*gom Corp.*, 618 P.2d at 505. "[I]t cannot be adopted as a general precept of contract law that, whenever one party to a contract can show injury flowing from the exercise of a contract right by the other, a basis for relief will be somehow devised by the courts." *Mann*, 586 P.2d at 464.

The judgment below is reversed. The parties shall bear their own costs on appeal.

GREENWOOD and ORME, JJ., concur.