**OLYMPUS HILLS SHOPPING CENTER, LTD., a Utah limited partnership, Plaintiff, Appellee and Cross–Appellant,**

v.

**SMITH'S FOOD & DRUG CENTERS, INC., a Delaware corporation, Defendant, Appellant and Cross–Appellee.**

No. 930531–CA.

Court of Appeals of Utah.

Dec. 29, 1994.

Rehearing Denied Feb. 27, 1995.

---

James S. Jardine, Rick B. Hoggard, and Brent D. Wride, Salt Lake City, for appellant.

Robert S. Campbell and E. Barney Gesas, Salt Lake City, for appellee.

Before BENCH, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Smith's Food & Drug Centers, Inc. (Smith's) appeals the trial court's denial of its motions for summary judgment and directed verdict concerning claims by Olympus Hills Shopping Center, Ltd. (Olympus Hills) that Smith's breached its lease with Olympus Hills, as well as the covenant of good faith and fair dealing associated with the lease. Smith's also challenges certain admissions of evidence and jury instructions by the trial court, along with the trial court's rulings concerning the sufficiency of Olympus Hills's notices of default and termination. Smith's also challenges the trial court's ruling concerning whether Olympus Hills waived its right to claim default of the lease. In its cross-appeal, Olympus Hills challenges the trial court's bifurcation of the determination of Olympus Hills's damages from the determination of Smith's liability. We affirm.

## FACTS

Olympus Hills owns a 13.9 acre shopping center in Salt Lake County, the development of which began in the early 1960s. Smith's leased 23,000 of the 160,000 total square feet of the shopping center from Olympus Hills in the 1960s to operate a grocery store. In January 1979 Smith's began negotiating with Olympus Hills for additional space. After extended negotiations, Smith's signed a thirty-year lease, obtaining an additional 22,000 square feet of space, for a total of 55,000 square feet.

In December 1989, Smith's purchased a building about 1.5 miles from the Olympus Hills location, and on March 7, 1990, announced its plan to close its Olympus Hills store. Olympus Hills negotiated with Smith's, attempting to convince Smith's to remain at the shopping center. When these negotiations failed, Olympus Hills filed a complaint on March 9, 1990, seeking monetary damages and injunctive relief. Smith's filed a counterclaim seeking a declaratory judgment of its rights under the lease. In its motion for summary judgment on its counterclaim, Smith's argued that the unambiguous language of the use clause gave Smith's the right to operate any "lawful retail selling business" at the shopping center. On April 3, 1990, the trial court determined that the lease's use clause, which provided that Smith's may use the building for "any other lawful retail selling business not directly in conflict or competition with another major tenant in the shopping center," allowed Smith's to operate any retail business that did not compete with other tenants.

On April 13, 1990, Smith's announced its intention to operate a "warehouse discount box store" to be known as "Buy 'N Save" on the premises. On April 23, 1990, Olympus Hills filed a second amended complaint, contending that Smith's proposed warehouse box store was a breach of the covenant of good faith and fair dealing. Smith's filed an answer along with a counterclaim for declaratory judgment to authorize Smith's to temporarily close the leased premises to implement its change of use. In the meantime, Olympus Hills, on April 27, 1990, served a notice of default on Smith's. Smith's filed a motion for summary judgment on the covenant of good faith claim; however, the trial court determined that this issue was one for the jury to determine.

Smith's shut down the entire leasehold premises on April 24, 1990, for sixty-three days while it remodeled the premises. On June 22, 1990, Olympus Hills filed its third amended complaint seeking termination of the lease and damages for breach of the continuous operation clause for closure of the store for remodeling, unlawful detainer, and declaratory relief regarding Smith's right to operate the Buy 'N Save. Smith's filed a motion for summary judgment and on August 24, 1990, the trial court determined that a jury should decide whether a complete closure of the premises of any length was

reasonable and, if so, whether the length of closure was reasonable. The court later denied Smith's motion concerning waiver and after trial, denied Smith's motion concerning the notice issues.

At the trial held in September 1990, the court ruled that Olympus Hills could not put on evidence before the jury concerning consequential damages, including diminution of value of the shopping center from the time the lease was breached to its termination. The court reasoned that any future damages incurred by Olympus Hills were speculative, and that it would retain jurisdiction and try the damage issues in the future, after determining whether Olympus Hills was entitled to terminate the lease.

At the end of Olympus Hills's case before the jury, Smith's moved for a directed verdict. The trial court denied the motion and sent the issues to the jury. The jury found that Smith's breached the covenant of good faith and fair dealing by changing the use of the premises from a supermarket to the Buy 'N Save. The jury also determined that although it was reasonably necessary for Smith's to close the premises in order to change its use, the closure for sixty-three days was unreasonably long and constituted a material breach of the lease and also a breach of the covenant of good faith and fair dealing.[1]

## ISSUES

This case raises the following issues: (1) whether the trial court properly submitted to the jury the issue of whether Smith's operation of the Buy 'N Save breached the covenant of good faith and fair dealing even though Smith's had the express right to operate any retail selling business in the leased space; (2) whether the trial court improperly admitted evidence at trial concerning the reduced traffic flow at the shopping center and

the "highest and best use" of the leased space; (3) whether the trial court properly rejected Smith's proffered jury instructions and whether the jury instructions given were legally sufficient; (4) whether the trial court properly submitted to the jury the issue of whether Smith's closure of the premises for sixty-three days breached the express provisions of the lease and the covenant of good faith and fair dealing; (5) whether the trial court properly determined that Olympus Hills's notices of default and termination were sufficient; (6) whether the trial court erred in determining that Olympus Hills's acceptance of Smith's May rent check during the cure period did not waive Olympus Hills's right to claim a default under the lease; and (7) whether the trial court improperly separated Olympus Hills's damages claims from the determination of Smith's liability under the lease.[2]

## ANALYSIS

### A. Good Faith Covenant v. Express Lease Provision

Smith's asserts that the trial court improperly denied its motion for summary judgment and later its motion for directed verdict on the issue of whether Smith's breached the covenant of good faith and fair dealing by choosing to operate the Buy 'N Save in the leased space. Smith's asserts the trial court could have decided the issue as a matter of law but instead, improperly submitted the issue to the jury. Specifically, Smith's claims that because the express provision of the lease allowed it to operate *any* retail selling business, it could not have breached the covenant of good faith and fair dealing by operating the Buy 'N Save. Smith's argues that as long as the changed use is to "any other lawful retail selling business," its discretion as to what type of business to operate could not be hampered by any duty of good faith.[3]

---

1. Because of the several motions, related hearings, and the three-week trial, the parties amassed a record of almost 6,000 pages.

2. Olympus Hills claims that Smith's failed to properly marshal the evidence regarding the issues it raises on appeal and thus, we should not consider them. *See Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 800 (Utah 1991). However, we

have reviewed the briefs and record and find this argument to be without merit.

3. Interestingly, Smith's conceded before the jury that "Olympus Hills is entitled to have a lawful retail selling business in the premises.... We have to make the decision [of] what kind of a retail selling business to put in there in good faith." Further, one of the jury instructions,

A trial court may properly grant a motion for summary judgment or directed verdict only when reasonable minds could not differ on the facts to be determined from the evidence presented. *Heslop v. Bank of Utah,* 839 P.2d 828, 838 (Utah 1992); *West One Trust Co. v. Morrison,* 861 P.2d 1058, 1060 (Utah App.1993); *see Nay v. General Motors Corp.,* 850 P.2d 1260, 1263 (Utah 1993). The trial court must assess those facts in a light most favorable to the party opposing the motions and must conclude, as a matter of law, that they do not support the claim presented. *Heslop,* 839 P.2d at 838.

Smith's argument poses the question of whether parties who retain express power or discretion under a contract can exercise that power or discretion in such a way as to breach the covenant of good faith and fair dealing.[4] We believe that they can. Our courts have determined that a party must exercise express rights awarded under a contract reasonably and in good faith. *See Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991) (contract rights should be exercised in good faith); *Resource Management Co. v. Weston Ranch and Livestock Co.,* 706 P.2d 1028, 1037 (Utah 1985) (party must exercise rights under contract reasonably and in good faith); *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 311 (Utah 1982) (party has duty to exercise all rights under contract reasonably and in good faith); *Ted R. Brown and Assocs., Inc. v. Carnes Corp,* 753 P.2d 964, 970 (Utah App.1988) (party must exercise express rights in good faith).

At first blush, this concept seems to contravene good sense because "if contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires." *Southwest Sav. and Loan Ass'n v. Sunamp Sys., Inc.,* 172 Ariz. 553, 838 P.2d 1314, 1319 (Ct.App.Div. 1 1992). However, contracting parties, hard as they may try, cannot reduce every understanding to a stated term. *Id.* Instances inevitably arise in which one party exercises discretion retained in a way that denies the other a reasonably expected benefit of the bargain. *Id.* For example, if taken to its logical extreme, the express provision of the lease in the instant case would allow Smith's to set up a cardboard box in the leased space and sell cigars, an action that would clearly deny Olympus Hills the expected benefit of its bargain.[5] The law of good faith and fair dealing, though inexact,[6] attempts a remedy for such abuse. *See Southwest Sav. and Loan,* 172 Ariz. 553, 838 P.2d

which Smith's does not challenge on appeal, states that "Smith's further contends that the Lease gives it the contractual right to choose the retail selling business which is in its own interest, so long as its use as a lawful retail selling business is not in bad faith."

4. It is fundamental that every contract includes a covenant of good faith and fair dealing with respect to dealings between the parties. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 199 (Utah 1991) (construction/development contract); *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 798 (Utah 1985) (insurance contract); *Rio Algom Corp. v. Jimco Ltd.,* 618 P.2d 497, 505 (Utah 1980) (uranium lease); *Ted R. Brown and Assocs., Inc. v. Carnes Corp.,* 753 P.2d 964, 970 (Utah App.1988) (sales agreement).

Many courts have stated that a covenant of good faith is "implied" in every contract, perhaps because a leading opinion, *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 188 N.E. 163, 167 (1933), used that language. 3A Arthur L. Corbin, Corbin on Contracts § 654A(B) (2d ed. 1993). "While it is true that courts impose an obligation of good faith in every aspect of the contractual relationship ... the obligation of good faith is 'constructive' rather than 'implied' " because the obligation is imposed by law and cannot be disclaimed. *Id.; accord Beck,* 701 P.2d at 801 n. 4 (duty to perform contract in good faith cannot, by definition, be waived by either party to agreement); *see also Republic Group, Inc. v. Won–Door Corp.,* 883 P.2d 285, 291 n. 10 (Utah App.1994) ("constructive covenant of good faith"); *Simmons v. Farmers Ins. Group,* 877 P.2d 1255, 1259 (Utah App.1994) (same); *TS 1 Partnership v. Allred,* 877 P.2d 156, 157 (Utah App.1994) (same); *Andalex Resources, Inc. v. Myers,* 871 P.2d 1041, 1047 (Utah App. 1994) (same).

5. In fact, one of Smith's executives suggested in his deposition that selling cigars from a box would not violate Smith's obligations so long as selling cigars was considered a "lawful retail selling business."

6. "[T]he concept of good faith and fair dealing is not susceptible to brightline definitions and tests." *Berube v. Fashion Centre Ltd.,* 771 P.2d 1033, 1047 (Utah 1989).

at 1319; Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 385–86 (1980) ("The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach."); Restatement (Second) of Contracts § 205 cmt. a (1979) ("[g]ood faith performance of enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

Consistent with Burton's approach and the Restatement examples, courts have determined in a variety of contexts that a contracting party can exercise a retained contractual power in bad faith. *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 107 Nev. 226, 808 P.2d 919, 923–24 n. 6 (1991) (lessee acts in bad faith, even though abiding by literal terms of contract, if it diverts business to another store solely to bring down rental payment tied to percentage of gross sales); *Resource Management*, 706 P.2d at 1037 (decision to terminate contract under express contractual right must be made in good faith); *Leigh Furniture*, 657 P.2d at 311 (corporation acted in bad faith in failing to approve prospective business partners without considering their merits, even though contract allowed corporation complete discretion in approving prospective partners); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 138–39 (Utah App.1992) (insurance company acts in bad faith by refusing to settle litigation against insured even though contract allows insurance company power to evaluate and adjust claims).

Thus, in this case, our inquiry does not end with the recognition that Smith's had the discretionary power or contractual authority to operate "any lawful retail selling business." The question is whether, upon a motion for summary judgment or directed verdict, the trial court properly found that reasonable minds could differ as to whether Smith's wrongfully exercised this power for a reason beyond the risks that Olympus Hills assumed in its lease with Smith's or for a reason inconsistent with Olympus Hills's "justified expectations." *See St. Benedict's*, 811 P.2d at 200; Restatement (Second) of Contracts § 205 cmt. a (1981).

■ The trial court correctly determined that Olympus Hills justifiably expected that Smith's would select a *reasonable* economic use for the property in good faith.[7] *See Resource Management*, 706 P.2d at 1038 (contract rights must be exercised in reasonable manner and in good faith); *Ted R. Brown*, 753 P.2d at 970 ("every contract imposes a duty on the parties to exercise their contractual rights and perform their contractual obligations reasonably"); *Leigh Furniture*, 657 P.2d at 311 (party breaches covenant of good faith and fair dealing if it fails to exercise all its rights under contract reasonably); *accord In re Vryonis*, 202 Cal.App.3d 712, 248 Cal.Rptr. 807, 812 (Div. 3 1988) (essence of covenant of good faith and fair dealing is objectively reasonable conduct).

Olympus Hills asserts that Smith's wrongfully exercised its express right to select any retail selling business in a manner inconsistent with Olympus Hills's justified expectations under the lease. Olympus Hills maintains that the evidence shows "manifest bad faith on the part of Smith's in attempting to invent an artificial use of the 'warehouse box store' at Olympus Hills." Olympus Hills argues that Smith's Buy 'N Save was a "sham" operation designed to improperly "freeze" the space in Olympus Hills and to force customers to its new location. Furthermore, Olympus Hills argues this bad faith conduct was inconsistent with its right to have Smith's select a reasonable use for the leased space. When viewing the facts most favorably to Olympus Hills, reasonable minds could differ as to whether Smith's acted in bad faith in changing the use of the leased

---

7. Smith's asserts, in connection with its challenge to the jury instructions discussed later in this opinion, that the test of good faith is not one of reasonableness. We disagree. As discussed below, Utah courts have consistently held that the test of good faith is one of reasonableness.

space to the warehouse box store, in violation of Olympus Hills's justified expectations. *See Nay*, 850 P.2d at 1263; *Heslop*, 839 P.2d at 838. Thus, the trial court properly submitted the issue to the jury. *See Western Farm Credit Bank v. Pratt*, 860 P.2d 376, 380 (Utah App.1993) (whether party has breached covenant of good faith and fair dealing is generally factual issue to be determined by factfinder, not issue subject to resolution as matter of law), *cert. denied*, 879 P.2d 266 (Utah 1994); Burton, *supra*, at 370 (question of whether party has acted in bad faith in connection with covenant of good faith and fair dealing is generally question of fact); 3A Arthur L. Corbin, Corbin on Contracts § 654B (2d ed. 1993) (if dispute exists concerning duty of good faith as to why contractual parties did what they did, there is question of fact for jury).

### 1. Evidence presented by Olympus Hills

Olympus Hills presented the following evidence pertaining to whether Smith's acted in bad faith in changing the use of the leased space to the warehouse box store, in violation of Olympus Hills's justified expectations:

In the late 1970s, during negotiations with Thomas Welch, Smith's corporate counsel, Welch told Olympus Hills of Smith's desire to make the Olympus Hills store Smith's "flagship" store. Olympus Hills advised Smith's that Smith's presence in the shopping center would determine the shopping center's success and it was important that they operate as a supermarket. Welch advised them that Smith's would be operating a supermarket at Olympus Hills beyond his or Olympus Hills's attorney's lifetimes.

Smith's was the "anchor tenant" at the center, generating significant customer traffic, necessary to the financial health and operation of the shopping center. Smith's received favorable lease terms and conditions because of its central role. For example, Smith's minimum rent was below the break-even point for the shopping center's operating costs. Smith's had a substantial and direct affect on the vacancy rate, rent return,

ability to retain and attract tenants, and the overall viability and value of the shopping center.

Smith's own market studies reflected that Olympus Hills was a strong, profitable store. There was never any discussion during negotiations concerning a non-supermarket use of the leased space.

After purchasing the site for its new store, Smith's decided to select a business for the Olympus Hills location that would not compete with its new grocery store. By this tactic Smith's reasoned that it would garner the shoppers that had previously used its Olympus Hills store. Smith's conceded that it "intentionally selected a use that would not be in direct competition" with its new store.

Smith's chose to operate the Buy 'N Save without any market analysis, a clear departure from Smith's historic practice. Smith's had never operated a warehouse box store before and it did not have any personnel trained or qualified to operate such a store.

Experts testified that to be reasonably successful, a warehouse box store should be centrally located in a marketing area so it can draw bulk-purchasing traffic from all directions. The Olympus Hills Shopping Center was not strategically located for warehouse box store operations, but rather was in the nature of a neighborhood shopping area with the barrier of the mountains directly to the east.

Smith's designed and inventoried the warehouse box store so it did not reasonably appeal to repeat weekly customers. Smith's did not design or operate the warehouse box store with an expectation that it would achieve a break-even point in operations or produce any percentage rent payments to Olympus Hills.

Michael Williams, Smith's employee assigned to create and design the warehouse box store, did not know what the target market area was for the store.[8] Smith's in-house marketing research department, nationally recognized for its accuracy and relia-

---

8. Mr. Williams, in frustration, even asked his pet dog at home why Smith's management engaged in such a project.

bility, did not conduct any feasibility study of the warehouse box store at Olympus Hills.

For bookkeeping purposes, Smith's characterized the Olympus Hills property as "surplus" during the pendency of Olympus Hills's action. The warehouse box store intentionally did not carry any fresh produce, bakery products, fresh meat, non-food products found in an ordinary retail grocery store, or any pharmacy items.

Smith's had never operated any type of warehouse box store prior to Olympus Hills. Smith's did not want its name associated with the warehouse box store. Customer traffic was down sixty percent after the opening of the Buy 'N Save.

Smith's box store manager, Mr. Kano, testified that he was uncomfortable operating the warehouse box store at Olympus Hills and attempted to meet some of the customer needs by installing a miniature produce stand. However, he was ordered by Smith's management to remove the stand. Smith's used no radio or television advertising for the store.

Smith's projected the Buy 'N Save breakeven point at between $70,000 to $97,000 in gross weekly sales. Experts opined that it would have to generate between $100,000 to $200,000 in sales per week to be profitable. The actual average weekly sales through trial were $16,800. Smith's supermarket, on the other hand, had the following gross sales at the Olympus Hills location: $9,479,000 in 1986; $13,380,000 in 1987; $16,225,000 in 1988; and $16,758,000 in 1989.

Smith's expert testified that if a leased property is not put to its reasonable economic use and if there is an obligation to keep the property operating, "then very likely the use that will be put in there will be an artificial use."

## 2. Evidence presented by Smith's

Smith's presented the following evidence concerning its choosing to operate the Buy 'N Save in the leased space:

Before it closed Smith's at the shopping center, Smith's looked for a suitable subtenant to operate a retail business from the space. Smith's proposed for approval to Olympus Hills a potential sublease to REI, a national sporting goods chain. Olympus Hills rejected that request, indicating that it would not approve any subtenant that was not a supermarket. Not wanting to relinquish its undepreciated investment in the leased space, exceeding one million dollars, and not wanting to turn over the property to a competing supermarket, considering the customer traffic Smith's had built up over twenty years, Smith's decided to operate a retail business on the premises itself.

Smith's spent at least $75,000 in remodeling the space into the Buy 'N Save. The Buy 'N Save also contained $45,000 in new equipment, $383,000 in equipment previously used on the premises, and about $578,000 in inventory. The store was operated between the hours of 9:00 a.m. and 9:00 p.m., six days a week, and used all the leased space.

The Buy 'N Save accounted for about 900 customer trips each day during its start up period and would have generated approximately $870,000 in sales its first year given its initial weekly average sales. Smith's presented evidence that its Olympus Hills' store was its second least profitable store in the area because of flattening sales, insufficient floor space, and a limited geographic customer base. The Smith's superstores being built and operated in 1990 generally required between 72,000 and 80,000 square feet of space.

Smith's examined other discount warehouse stores in Salt Lake and other states in connection with its opening of the Buy 'N Save. Witnesses stated that the Buy 'N Save was not a typical warehouse discount store because it carried a large variety and selection of products, including convenience items such as dairy products and meats, and had a nicer decor than the typical store. Smith's testified that it treated the Buy 'N Save as an "evolving concept" and had planned to modify the format as needed to improve sales. Smith's also opened a similar store in Clearfield, Utah and determined that long-term development of this type of store would depend on the ultimate success of the Clearfield and Olympus Hills stores. Smith's

believed that the Buy 'N Save could ultimately make a profit at Olympus Hills.

Former supermarket space has historically been converted into a variety of secondary uses, including discount drug stores, fabric shops, and hardware stores.

Viewing the above evidence in a light most favorable to Olympus Hills, we agree with the trial court that reasonable minds could differ as to whether Smith's had breached its covenant of good faith and fair dealing by choosing to operate the Buy 'N Save. The evidence viewed most favorably to Olympus Hills could show that Smith's decision to change its use of the premises to a warehouse box store was without market analysis, demand, or even the possibility that the manufactured use would be economically successful. The evidence could also reasonably show that Smith's motive was to "freeze" or "down-use" the Olympus Hills premises and block reasonable commercial operations on it to support its marketing efforts at its new location. Reasonable minds could also differ as to whether Smith's use of the space—contrary to market demand and commercial business judgment—deprived Olympus Hills of its justified expectations under the lease. Thus, the trial court properly denied the motions and allowed the issue to go to the jury.

## B. Admission of Evidence

Smith's also argues that the trial court improperly admitted the following evidence at trial:

(1) Olympus Hills called an expert on traffic surveys who presented evidence that traffic counts at the center were sixty percent lower with the Buy 'N Save than with Smith's former supermarket.

(2) Another tenant at the Olympus Hills shopping center testified that the reduced traffic from Smith's change of use adversely affected her sales volume and threatened her business.

(3) Experts testified that the highest and best use of the premises was as a supermarket.

Smith's argues that this evidence was irrelevant and highly prejudicial, suggesting that Smith's had a duty to Olympus Hills and other tenants to operate as an anchor tenant and generate traffic. Further, Smith's claims this suggestion of Smith's duty to operate as an anchor tenant directly conflicts with the terms of the lease, which allowed Smith's to operate any retail selling business without any duty to generate percentage sales or traffic.[9]

### 1. Relevancy

■ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R.Evid. 401. Determining whether evidence is relevant "requires a balancing of factors, and we will reverse a determination of relevancy only if the trial court abused its discretion." State v. Wetzel, 868 P.2d 64, 67 (Utah 1993).

■ Smith's objected to evidence relating to the traffic counts, stating that the "lease obligates Smith's to run a business in that space and not to generate a lot of traffic for this center." The trial court determined that although the testimony was not admissible as to a contractual duty by Smith's under the lease to generate traffic, it was relevant to determining whether Smith's had breached its covenant of good faith and fair dealing. We agree. As the trial court instructed the jury, "just because evidence may come in does not mean it can be used for all purposes." See Hill v. Hartog, 658 P.2d 1206, 1208 (Utah 1983) (evidence which is improper for one purpose cannot be excluded if it is admissible for another purpose). Here, the traffic evidence is relevant to whether Smith's breached its covenant of good faith and fair dealing. Smith's was obligated, in good faith, to choose a business to operate in the leased space. Because that meant choos-

9. The lease provides that Smith's "makes no representation or warranty as to the sales which it expects to make in the leased premises."

ing an economically reasonable business, the traffic count evidence was relevant to whether the Buy 'N Save was an economically reasonable choice.

For example, if Smith's Buy 'N Save generated 4,000 customers per day for an extended period of time, this evidence would be relevant to whether the business was economically reasonable. Similarly, if the store consistently generated only 10 customers per day, this evidence would be equally relevant.

Evidence showing the effect of Smith's Buy 'N Save on other tenants' businesses was also relevant, even if remotely, to whether the Buy 'N Save was an economically reasonable choice.[10] The tenant testified that she recorded an immediate significant drop in business. This evidence was relevant to the amount of business the Buy 'N Save received because, as the tenant testified, a portion of her customers also shopped at the Smith's location during the same stop.

■ The testimony as to the "highest and best use" of the premises also can be considered relevant to whether the Buy 'N Save was a reasonable choice. The testimony concerning the highest and best use was given from Smith's perspective. Clearly, the highest and best use of the premises would also be a reasonable use of the premises. Thus, we find the trial court did not abuse its discretion in admitting the above evidence.

### 2. Prejudice

■ Smith's also argues that even if relevant, the evidence was prejudicial in that it established in the jury's mind the obligation for Smith's to choose "the highest and best use" of the property—a supermarket/anchor tenant. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Utah R.Evid. 403. Evidence is unfairly prejudicial if it has a tendency to "influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision

on something other than the established propositions of the case." *Terry v. Zions Co-op Mercantile Inst.*, 605 P.2d 314, 323 n. 1 (Utah 1979). We review a trial court's determination that evidence is not unfairly prejudicial under an abuse of discretion standard and "reverse only if the ruling is beyond the bounds of reasonability." *Nay v. General Motors Corp.*, 850 P.2d 1260, 1262 (Utah 1993).

■ One expert and one tenant in the shopping center testified that traffic declined after Smith's started operating the Buy 'N Save. Additionally, two experts, Mr. Brubaker and Mr. Throndsen, testified that the highest and best use of the leased space was as a supermarket. We cannot say it was beyond the bounds of reasonability for the trial court to admit the evidence.

First, even if the admitted evidence suggested to the jury the obligation for Smith's to act as an anchor tenant, as discussed above, it is possible that the duty to select a reasonable economic use for the property would result in Smith's operating as an anchor tenant.

Second, in considering the evidence cited by Smith's, along with the oral instructions by the trial court and the written jury instructions, we do not believe the jury was improperly influenced into believing Smith's was required to choose the "highest and best use" of the premises to comply with its covenant of good faith and fair dealing.

The experts clearly testified that the "highest and best use" was not the only reasonable use. For example, Mr. Brubaker stated that although the "most economically reasonable use would be the highest and best use, . . . there may be other uses that would support less profit potential, but would still provide an adequate return on investment." He defined a reasonable economic use as "one that the tenant would expect to generate . . . an adequate return on his investment." Mr. Throndsen defined "highest and best use" as "the most probable use," not a reasonable use. He consistently differentiated between a reasonable use and the "high-

---

**10.** Remoteness goes to the weight, not the admissibility, of evidence. *Terry v. Zions Co-op. Mer-* *cantile Inst.*, 605 P.2d 314, 323 n. 30 (Utah 1979).

est and best use" in his testimony. This testimony suggested that other uses, besides the highest and best use, could be considered reasonable.

The jury instructions clearly state that the choice made by Smith's must be a reasonable one. The instructions do not state that the choice had to be the best one or that Smith's must operate as an anchor tenant. Further, the trial court repeatedly instructed the jury that the decision must be "reasonable" from the tenant's perspective. In fact, the trial court consistently struck testimony that did not conform to its parameter of only allowing evidence of reasonable economic uses from Smith's perspective.

Accordingly, we find the experts' statements concerning the highest and best use of the property and the testimony concerning the traffic counts, when considered with the jury instructions, were not unfairly prejudicial. Whatever small potential for unfair prejudice this evidence might have had was outweighed by its probativeness. Thus, we cannot say the trial court abused its discretion in admitting the evidence.

### C. Jury Instructions

Smith's asserts the trial court improperly refused to instruct the jury that (1) there could be no duty different from or contradictory to an express right under the lease, (2) the lease did not require Smith's to operate an anchor-type business, and (3) Olympus Hills's benefit of the bargain under the lease was the operation of a "lawful retail selling business."

An appeal challenging the trial court's refusal to give a jury instruction presents a question of law, which we review for correctness. *Ong Int'l (U.S.A.), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 452 (Utah 1993); *State v. Tennyson*, 850 P.2d 461, 470 (Utah App. 1993).

First, Smith's is correct that courts will not infer duties different from or contradictory to express rights of a contract. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). However, a more correct statement of the law in this case is that when a party has been granted discretion under a

contract, that discretion may not be "exercised capriciously or in bad faith." *Resource Management Co. v. Weston Ranch and Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985). Rather, the law imposes a duty to exercise that express contractual discretion in good faith. *Id.* In this case, Smith's has been granted discretion under the contract to determine what type of retail selling business to operate in the leased space. Thus, the trial court was correct in refusing to give the requested instruction, instructing the jury, instead, that "[w]here a contract confers on one party a discretionary power affecting the rights and interests of the other party, that discretionary power cannot be exercised arbitrarily, unreasonably, unfairly or in bad faith."

Second, the trial court was also correct in refusing to instruct the jury that the lease did not require Smith's to operate an anchor-type business. Even though the lease provided that Smith's was not required to generate a specific amount of percentage rentals for Olympus Hills, the covenant of good faith and fair dealing required Smith's to select a reasonable economic use for the leased space. *See Ted R. Brown and Assocs., Inc. v. Carnes Corp.*, 753 P.2d 964, 968 (Utah App. 1988). By definition, a reasonable business from Smith's perspective might have required them to operate as an "anchor tenant," considering the location of the shopping center and the amount of space leased by Smith's. This was a decision left for the jury. Thus, we find it was correct for the trial court to refuse to instruct the jury that Smith's was not required to operate as an anchor tenant.

Third, Smith's asserts that the trial court should have instructed the jury that Olympus Hills's benefit of the bargain under the lease was the operation of a "lawful retail selling business." Smith's was attempting to instruct the jury that Smith's could breach the lease only if the Buy 'N Save was not a lawful retail selling business, that Olympus Hills's justified expectation under the lease was only that Smith's would operate a retail selling business. As stated above, this proposition is incorrect. Our courts have determined that a party must exercise express

rights awarded under a contract reasonably and in good faith. *Ted R. Brown*, 753 P.2d at 970; *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 311 (Utah 1982). Thus, Olympus Hills's benefit of the bargain, as Smith's conceded before the jury,[11] was that Smith's select a retail selling business in good faith. Accordingly, the trial court properly refused the requested instruction.[12]

■ Smith's also contends that the trial court gave the jury improper jury instructions because they were incorrect or incomplete statements of the law.[13] Smith's asserts that these instructions were erroneous because they did not instruct the jury that the duty of good faith cannot conflict with the express provisions of the contract, that Smith's had no duty to operate an anchor tenant-type business, and that the test of good faith was not one of reasonableness. This court reviews jury instructions for correctness and will only reverse if the instructions as a whole were prejudicial or insuffi-

ciently advised the jury on the applicable law. *Mikkelsen v. Haslam*, 764 P.2d 1384, 1387 (Utah App.1988).

As discussed above, even express rights in a contract must be performed in good faith. In this case, good faith required a reasonable economic use of the premises. Thus, it would have been improper for the trial court to instruct the jury that Smith's had no duty to operate an anchor tenant-type business.[14]

■ Smith's also claims that it was improper to instruct the jury that the test of good faith was one of reasonableness. First, Smith's itself advocated the proposition that the test of good faith was reasonableness in its proposed jury instruction No. 70, requesting that Smith's be found to have acted in good faith and to have dealt fairly so long as it acted "reasonably." Second, case law clearly supports the proposition that the test of good faith is one of reasonableness. *See Resource Management*, 706 P.2d at 1038 (if

---

**11.** *See supra* note 3.

**12.** Smith's also seems to suggest that a cause of action under the covenant of good faith and fair dealing can only arise if Smith's has breached an express provision of the lease. However, breach of the covenant of good faith and fair dealing is an independent cause of action. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991).

**13.** Smith's alleges the following jury instructions were incorrect or incomplete:

INSTRUCTION NO. 28

You are instructed that it is the law of this State that in every contract, including the lease between Olympus Hills and Smith's there is the implied covenant of good faith and fair dealing. That is to say that such a covenant need not be expressly set forth in every clause or even generally in the contract because the law implies the covenant as an essential provision of the contract.

The implied covenant of good faith and fair dealing imposes on each party to a contract the duty and obligation to deal reasonably, fairly and in good faith with the other party to the contract; to refrain from any conduct that would deny or injure the right of the other party to receive the benefits of the bargain. Olympus Hills has the burden of showing that Smith's has acted unfairly or in bad faith to deprive Olympus Hills of the benefit of its bargain.

Where a contract confers on one party a discretionary power affecting the rights and interests of the other party, that discretionary power

cannot be exercised arbitrarily, unreasonably, unfairly or in bad faith.

In managing its affairs, a party to a contract is entitled to exercise managerial discretion so long as it is exercised reasonably and in good faith.

A duty of good faith does not mean that a party vested with a contractual right is obligated to exercise that right to its own detriment for the purpose of benefiting another party to the contract.

INSTRUCTION NO. 32

Under paragraph 4.01 of the Lease, Smith's has the right to use the premises as "a supermarket, drug store and pharmacy or any other lawful retail selling business not directly in conflict or competition with another major tenant in the shopping center." This Court has ruled previously that this provision allows Smith's to change its use of the premises from a supermarket and drugstore to any other lawful retail selling business. However, you are instructed that Smith's, in exercising its discretion to change the use of the premises, must comply with the covenant of good faith and fair dealing as defined in these instructions.

INSTRUCTION NO. 33

The Lease in paragraph 3.04 provides that Smith's "makes no representation or warranty as to the sales which it expects to make in the leased premises." However, Smith's must comply with the covenant of good faith and fair dealing as defined in these instructions.

**14.** Further, contrary to assertions made by Smith's, Olympus Hills's experts consistently differentiated between a reasonable use and the highest and best use of the property.

one party to a contract has been awarded sole discretion on a term or condition under the contract, such discretion cannot be exercised arbitrarily, but must be exercised reasonably, based on fair dealing and good faith) (citing *Midwest Management Corp. v. Stephens*, 291 N.W.2d 896, 913 (Iowa 1980)); *Leigh Furniture*, 657 P.2d at 311 (party breaches covenant of good faith and fair dealing if it fails to exercise all its rights under contract reasonably); *Ted R. Brown*, 753 P.2d at 970 ("It is fundamental that every contract imposes a duty on the parties to exercise their contractual rights and perform their contractual obligations *reasonably* and in good faith.") (emphasis added); *accord In re Vryonis*, 202 Cal.App.3d 712, 248 Cal.Rptr. 807, 812 (2 Dist.1988) (essence of covenant of good faith and fair dealing is objectively reasonable conduct). Thus, we conclude that the trial court's instructions were not prejudicial and that they sufficiently advised the jury on the applicable law.

### D. Continuous Operations Clause

Next, Smith's asserts the trial court improperly denied its motion for summary judgment and later its motion for directed verdict concerning whether Smith's materially breached the continuous operations clause of the lease. The continuous operations clause states: "Lessee shall, during the en-

tire term of the Lease hereby created, conduct and carry on in the demised premises the type of business for which the demised premises are leased."

The trial court submitted to the jury the issue of whether closing the location for sixty-three days was a material breach of the continuous operations clause of the lease.[15] Smith's asserts that the trial court "erred in not ruling as a matter of law that the length of the closure was not material."

 Olympus Hills claims the closure of the premises was unreasonably long, in violation of the continuous operation clause of the lease. Smith's asserts that the trial court should have determined, as a matter of law, that the closure was not a material breach of the lease, but rather a temporary closure.[16] When viewing the facts most favorably to Olympus Hills, reasonable minds could differ as to whether Smith's closure for sixty-three days was a material breach of the lease. Whether a party has materially breached a lease is generally a question of fact for the fact finder. *Liddle v. Petty*, 249 Mont. 442, 816 P.2d 1066, 1068 (1991); *McKeon v. Williams*, 104 Or.App. 106, 799 P.2d 198, 200 (1990), *aff'd* 312 Or. 322, 822 P.2d 699 (1991); *see Shepherd v. Shepherd*, 876 P.2d 429, 432 (Utah App.1994).

**15.** Smith's argues that the trial court erred by not submitting a jury instruction using the definition of material breach in *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979). The trial court's instruction defining material breach was submitted to the court by Smith's. Later, Smith's objected to its own instruction and proposed the *Polyglycoat* definition. Then, Smith's withdrew the proposed change and its objection to the instruction. Thus, Smith's has waived its objection to the jury instruction. *See* Utah R.Civ.P. 51; *In re Estate of Russell*, 852 P.2d 997, 1000 (Utah 1993).

**16.** Smith's asserts that the trial court should have concluded that the test for determining whether Smith's violated the continuous use clause was whether the closure was temporary, not whether the amount of time the premises was closed was reasonable. Smith's argues that because the lease as a whole "contemplates" temporary closures even though not specifically provided, such as when removing fixtures or before subletting the premises, the test for closure should be whether the closure was tempo-

rary, not whether it was reasonable. We disagree. While closures seem to be contemplated by the lease in some instances, this does not exclude the necessity of considering whether a closure under the lease is reasonable. *See Allstate Enters., Inc. v. Heriford*, 772 P.2d 466, 468 (Utah App.1989) (courts may only supply reasonable terms to contract); *Davis v. Cramer*, 837 P.2d 218, 222 (Colo. Ct.App.1992) (implied terms are analyzed under reasonableness test). The trial court supplied the condition that Smith's could close the premises under the lease. Thus, the closure must meet the test of reasonableness, including the duration.

If the proper test was one of "temporariness," as long as any work was being performed on the project, Smith's could have "remodeled" the premises for two years or longer and not violate the continuous operations clause. We do not believe such a reading to be reasonable. *See Barnhart v. McKinney*, 235 Kan. 511, 682 P.2d 112, 120 (1984) (courts should avoid unreasonable interpretation when contract provision would be reduced to absurdity).

## 1. Evidence Presented by Olympus Hills

Olympus Hills presented the following evidence pertaining to whether it was unreasonable for Smith's to close the location for sixty-three days, thus materially breaching the lease:

An expert for Olympus Hills testified that it was not necessary to completely close the location for remodeling. Olympus Hills experts testified that the remodeling could have reasonably been completed in three to four weeks. After Smith's closure, tenant defaults increased, vacancies increased, and it became more difficult to attract new tenants to Olympus Hills.

Olympus Hills's senior supermarket operations expert testified that construction in converting the Olympus Hills premises from a supermarket to a warehouse box store could have been reasonably performed in twenty to thirty days and within a ten-day period on an accelerated basis.

Another expert, a former American Stores supervisor of supermarket construction and remodelling, charted the construction by Smith's and stated that a reasonable time for conversion to the warehouse box store was fourteen days or less and that the conversion under normal conditions could have been completed in thirty days.

Smith's construction cost of conversion to the warehouse box store at Olympus Hills was less than $100,000. On the other hand, in converting the site for its new store, Smith's undertook major reconstruction and upgrading costs exceeding $1,500,000, completing the project in eleven weeks. One witness who observed the remodeling testified that normally only one or two workers were present on the site at any given time and that work was not done on Saturdays or evenings.

An expert testified that sixty-three days was an unreasonable time period for the location to be closed. He stated that "[t]here would be no legitimate reason in my opinion that they would remain closed for that length of time."

One of Olympus Hills's experts stated that it would be "advantageous to close on a temporary basis, certainly not to exceed a week, ... to help communicate to the customer that something new and different is taking place, something new and better is coming."

## 2. Evidence Presented by Smith's

Smith's presented the following evidence relating to whether Smith's materially breached the continuous operations clause of the lease by closing the location for sixty-three days:

Smith's expert testified that the closure for sixty-three days was a reasonable time period. He stated that "the time frame that the work was accomplished in was entirely consistent with the scope of the work and my experience."[17] Smith's claimed the closure amounted to only one month over what the experts stated was reasonable. This was one month of a thirty-year lease in which Smith's had an undepreciated investment of $1,300,-000.

Viewing the above evidence in the light most favorable to Olympus Hills, we agree with the trial court that reasonable minds could differ as to whether Smith's closure for sixty-three days was reasonable; that is, whether Smith's materially breached the continuous operations clause of the lease. Thus, the trial court properly submitted the issue to the jury rather than deciding it as a matter of law.[18]

17. Smith's only expert was from Texas, had been in Utah only three times, was completely unfamiliar with construction practices in Salt Lake County, had never seen the Olympus Hills premises used as a supermarket, and could not tell the jury where the Buy 'N Save was located. He did not review any of the actual daily records for the construction activities or time records for any of the crews or contractors working on the job.

18. Smith's also asserts that the trial court improperly submitted to the jury the issue of whether Smith's breached the covenant of good faith and fair dealing associated with the continuous operations clause of the lease. Olympus Hills asserts that Smith's, in bad faith, intentionally delayed the opening of the Buy 'N Save to change its customers' buying habits so the customers would use the new store, rather than the Buy 'N Save. Olympus Hills claims that "Smith's decision to shut-down the premises for

## E. Insufficient Notice

Smith's argues the trial court improperly ruled that the notice of default and notice of termination sent by Olympus Hills were legally sufficient. Olympus Hills sought to terminate Smith's lease and to invoke unlawful detainer penalties through two notices: a notice of default letter dated April 27, 1990, and a notice of termination letter dated June 8, 1990.

### 1. Notice of Default

The lease provides that Olympus Hills is entitled to terminate the lease "after thirty (30) days' prior written notice to lessee." A notice of default must "plainly indicate the nature of the default or breach and give reasonable notice that failure to cure the default within the time allowed may lead to termination." *Bentley v. Potter*, 694 P.2d 617, 620 (Utah 1984). Smith's alleges the notice of default letter of April 27, 1990, is deficient because the only default mentioned by the notice is Smith's closure of the store violating the continuous operations clause of the lease. Thus, Smith's argues, because the jury found it was reasonable to close the store to remodel, the only default mentioned in the notice was not actually a default.

We find this argument to be without merit. The lease provides that the lessee shall conduct and carry on business in the premises during the entire term of the lease. Olympus Hills interpreted Smith's closure as a breach of this lease provision and so stated in its letter. It would be an unfair burden to require Olympus Hills to anticipate at the time of a breach exactly how litigation would

evolve in interpreting this lease provision and what the jury would find. Even if we agreed with Smith's position, the notice of default also refers to another default or breach. The letter states that the "substantial period proposed by Smith's to remodel the premises" was unreasonable and was a bad faith maneuver to divert customers to the new location. The jury agreed, finding that the remodel time was unreasonable and that Smith's violated the constructive covenant of good faith. Thus, we agree with the trial court that the nature of the default or breach was stated and that the letter gave reasonable notice that the failure to cure the default within the time allowed would lead to termination. Thus, we find that the default notice provided by Olympus Hills was sufficient.

### 2. Notice of Unlawful Detainer or Termination

The trial court found Smith's guilty of unlawful detainer and awarded Olympus Hills treble damages. Utah Code Ann. § 78-36-3(1)(e) (1992) provides that a tenant is guilty of unlawful detainer when the tenant continues in possession after failure to perform any condition or covenant of the lease, after "notice in writing requiring in the alternative the performance of the conditions or covenant or the surrender of the property," and after the tenant does not comply within three days of being served.

Smith's alleges that the April 27, 1990 letter does not contain the required "alternative of performance" and that the letter's reference to the contractual cure period does not satisfy the statutory requirement. The letter states that "[i]n the event

the 63-day period was one that suited its own convenience and desires of driving the shopping public away from Olympus Hills to the [new] site, not upon any genuine necessity of construction time."

Olympus Hills's experts testified that if the ordinary retail operator is interested in preserving the previously established customer base, it will attempt to keep the store open, at least in part, during remodeling. Experts stated that the sixty-three-day closure diverted the customer base of the Olympus Hills Center to Smith's new store. Smith's made sure that the new site was up and running before it closed the Olympus Hills store. Traffic at the shopping center decreased seventy-one percent during the closure

of the leased premises as compared with traffic during Smith's operation at Olympus Hills.

On the other hand, Smith's asserted that the Buy 'N Save, by nature and design, was not in competition with the new Smith's store. Further, Smith's asserts that it was generally targeting a different buying population when it opened the Buy 'N Save; thus, whether it closed for a period of time was irrelevant.

When viewing these facts in a light most favorable to Olympus Hills, we conclude that reasonable minds could differ as to whether Smith's breached the covenant of good faith and fair dealing associated with the continuous operations clause. Thus, the trial court properly submitted the issue to the jury.

that Smith's does not immediately re-open and continuously conduct normal business operations in the premises, Olympus Hills will terminate the Lease ... as well as seek damages and all other available legal relief for the breach." We believe this language expresses the alternative of performing or surrendering the property. Thus, the notice of default met the requirements of section 78–36–3(1)(e).

## F. Waiver

■■■ Smith's argues that Olympus Hills waived any defaults of which Olympus Hills had knowledge because Olympus Hills accepted and negotiated Smith's May rent check two weeks after giving Smith's the notice of default. Waiver is foremost a question of intent and "the intent to relinquish a right must be distinct." *Soter's, Inc. v. Deseret Fed. Sav. and Loan Ass'n,* 857 P.2d 935, 941 (Utah 1993). Whether a party has waived a right is generally a factual question and thus, we accord considerable deference to the trial court's factual determinations. *State v. Pena,* 869 P.2d 932, 938 (Utah 1994) (waiver is "a highly fact-dependent question" and we give trial court increased discretion in applying general waiver principles to particular facts); *Barnes v. Wood,* 750 P.2d 1226, 1230 (Utah App.1988).

■■■ The facts do not show that Olympus Hills intended to waive its right to claim default under the lease. Rather, they show a definite course by Olympus Hills to terminate the lease. We recognize that acceptance of rental payments may constitute waiver of a claim of breach. *Girard v. Appleby,* 660 P.2d 245, 248 (Utah 1983); *Woodland Theatres, Inc. v. ABC Intermountain Theatres, Inc.,* 560 P.2d 700, 701 (Utah 1977). However, this is just one fact to consider in determining whether there was a waiver. *Glad–Nan Corp. v. Henry's Drive–In, Inc.,* 29 Ill.App.2d 363, 173 N.E.2d 521, 523 (1961); *Dunbar Housing Auth. v. Nesmith,* 184 W.Va. 288, 400 S.E.2d 296, 300 (1990); *see Pena,* 869 P.2d at 938.

We agree with the trial court that "[a] lease provision allowing a cure period is a benefit to the lessee and should not be twisted to limit the opportunity for a lessor to collect rent during the period in which a lessee can correct a breach or alleged breach." *See NL Indus., Inc. v. Paine-Webber, Inc.,* 720 F.Supp. 293, 303 (S.D.N.Y. 1989); *accord Witkoff v. Shopwell, Inc.,* 112 A.D.2d 295, 491 N.Y.S.2d 740, 742 (1985) (acceptance of rent during cure period does not constitute per se waiver).

■■■ Thus, we conclude that under these specific facts, the trial court did not abuse its discretion in determining that the acceptance of the rent check by Olympus Hills did not constitute waiver.[19]

## G. Cross Appeal

At trial, the trial court ruled that it would not receive evidence regarding general and consequential damages flowing from Smith's alleged breach, but would wait until there had been a determination of whether Smith's had in fact and in law breached the lease. The trial court ruled that it would retain jurisdiction and try general and consequential damages in the future if Smith's was found to have breached the lease.

Olympus Hills claims that the trial court improperly bifurcated its claim for consequential damages and that Olympus Hills has been prejudiced because it "will likely have to submit much of the same evidence to the court and jury in the damage phase, that was already submitted and heard in the trial in September 1990." Olympus Hills argues that this is "contrary to judicial economy" and has caused Olympus Hills needless expense. Smith's asserts the trial court properly delayed any ruling on the alleged diminution-in-value damages because those damages were too speculative.

---

**19.** For the first time in its reply brief, Smith's also asserts that because Olympus Hills accepted rent for four days after the cure period, it waived its claim of default. However, because Smith's failed to raise this claim below, we do not address it on appeal. *See Ong Int'l (U.S.A.), Inc. v. 11th Ave. Corp.,* 850 P.2d 447, 455 (Utah 1993); *Espinal v. Salt Lake City Bd. of Educ.,* 797 P.2d 412, 413 (Utah 1990).

Utah Rule of Civil Procedure 42(b) provides that "[t]he court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim . . . or issue." Trial courts "enjoy considerable discretion" in determining whether to bifurcate issues under Rule 42. *Slusher v. Ospital*, 777 P.2d 437, 441 (Utah 1989). The trial court reasoned that testimony concerning diminution in value of the property was too "speculative" because it had to assume too much over a period beginning with a possible jury verdict requiring forfeiture and ending twenty-five years hence at the contractual termination of Smith's lease. Further, the court explained that "the Olympus Hills property today, encumbered by the lease, is completely different from the property unencumbered by the lease." The trial court further stated that although the damages at the time of trial projected into the future were speculative, following the trial, the speculation would diminish or be "eradicated." Olympus Hills has not shown that the trial court abused its discretion by this determination. Accordingly, we believe the trial court properly deferred consideration of the damages issues until after liability was determined.

## CONCLUSION

The trial court properly denied Smith's motions for summary judgment and directed verdict because reasonable minds could differ concerning whether Smith's operation of the Buy 'N Save breached the covenant of good faith and fair dealing even though Smith's had the express right to operate any retail selling business in the leased space. The trial court did not abuse its discretion in admitting evidence concerning the uses of the leased space. Further, the trial court correctly refused to give the contested jury instructions and did not err in giving the other challenged jury instructions because they were legally sufficient. Also, the trial court properly submitted to the jury the issue of whether Smith's closure of the premises for sixty-three days breached the express provisions of the lease and the covenant of good faith and fair dealing. We also agree that the trial court properly determined that Olympus Hills's notices of default and termination were sufficient, and that Olympus Hills's acceptance of Smith's May rent check during the cure period did not waive Olympus Hills's right to claim a default under the lease. Moreover, we conclude that the trial court did not abuse its discretion in separating Olympus Hills's damages claims from the determination of Smith's liability under the lease. Accordingly, we affirm the determinations of the trial court.

GREENWOOD, J., concurs.

BENCH, Judge (concurring and dissenting):

I concur in the main opinion's holding regarding the Continuous Operation Clause of the parties' lease. That issue was properly decided by the jury. I dissent, however, from the main opinion's holdings regarding (1) the implied covenant of good faith and fair dealing, and (2) unlawful detainer. Those issues should have been resolved by the trial court, as a matter of law.

### (1) Implied Covenant of Good Faith and Fair Dealing

Olympus Hills Shopping Center Ltd. (Olympus Hills) argued before the trial court that the decision of Smith's Food & Drug Centers (Smiths) to replace its full-service supermarket with a Buy 'N Save discount supermarket breached the Use Clause in the lease and the implied covenant of good faith and fair dealing. Smiths moved for summary judgment on Olympus Hills's claims. The trial court granted Smiths's motion, only in part, ruling that the Use Clause unambiguously "allows commercial operations beyond a supermarket, drugstore and pharmacy" and that "[t]he only limitations are that defendant's operations be at the retail level and not compete with other major tenants." The trial court nonetheless denied Smiths's motion as to the implied covenant of good faith and fair dealing and allowed that issue to go to the jury. Specifically, the trial court instructed the jury to decide whether

Smith's violated the covenant of good faith and fair dealing . . . by either unreasonably, unfairly or in bad faith exercising its discretion to change uses by shutting down

the supermarket, drug and pharmacy operation ... and opening in its place ... a warehouse box store, said use being designed to force established and potential customer traffic ... to shop at Smith's newly opened superstore, drugstore and pharmacy....

At the end of Olympus Hills's case, the trial court denied Smiths's motion for a directed verdict. The jury found that Smiths breached the covenant of good faith and fair dealing under the Use Clause, despite the trial court's earlier summary judgment holding that Smiths had complied with the Use Clause as a matter of law.

Smiths argues on appeal that the trial court erred by denying its motion for summary judgment on the issue of whether it breached the implied covenant of good faith and fair dealing and by allowing this issue to go to the jury.[1] Smiths further argues that the trial court erred by denying its motion for a directed verdict. Both arguments have merit.

The main opinion recognizes that "Smith's is correct in its statement of the law that courts will not imply duties that are different from or contradictory to express rights in the contract." However, the main opinion then completely ignores its own statement of the controlling law and sanctions the use of the implied covenant of good faith and fair dealing as a tool to create duties and obligations in direct conflict with express contractual provisions.

A covenant of good faith and fair dealing inheres to most contractual relationships by operation of law. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991); *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991); *Seare v. University of Utah Sch. of Medicine*, 882 P.2d 673, 678 (Utah App.1994). The purpose of the covenant of good faith and fair dealing is to insure that neither party will "intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's*, 811 P.2d at 199; *accord Bastian v. Cedar Hills Inv. & Land Co.*, 632 P.2d 818, 821 (Utah 1981).

An implied covenant of good faith and fair dealing may not, however, be used to create a duty that is inconsistent with express terms of the contract. In *Brehany*, the Utah Supreme Court stated:

> Under the implied covenant of good faith ... the parties of a contract are deemed to intend that the terms of a contract should be construed in a manner which assumes the parties intended that the duties and rights created by the contract should be performed and exercised in good faith. *Such a covenant cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties. Nor can a covenant of good faith be used to nullify a right granted by a contract to one of the parties or to require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest.*

*Brehany*, 812 P.2d at 55 (emphasis added). The supreme court further stated that "[n]o obligation can be implied ... which would be inconsistent with the other terms of the contractual relationship." *Id.* (quoting *Murphy v. American Home Prod.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983)); *accord Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980). Similarly, in *Seare*, 882 P.2d at 678, the court of appeals stated:

> Although contracts are subject to implied covenants of good faith, such covenants " 'cannot be construed ... to establish new, independent rights or duties not agreed upon by the parties.' " *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 308 (Utah 1992) (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991)). Thus, these covenants are implied in contracts "to protect the express covenants or promises of the contract...." *Peterson v.*

---

1. Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990); *accord* Utah R.Civ.P. 56(c). Because the underlying facts are undisputed, the trial court's denial of Smiths's motion should be reviewed as a matter of law. *Estate Landscape v. Mountain States Tel. Co.*, 844 P.2d 322, 326 (Utah 1992).

*Browning*, 832 P.2d 1280, 1284 (Utah 1992) (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 232, 765 P.2d 373, 394 (1988)).

Judge Greenwood, writing for the court, explained in *Seare* that where there are no express covenants or promises in a contract compelling a party to the contract to act in a particular manner, "there could be no implied covenants or promises to do the same." *Id.* 882 P.2d at 678–79.

In *Ted R. Brown and Associates v. Carnes Corp.*, 753 P.2d 964 (Utah App.1988), Judge Jackson likewise rejected the notion that the implied covenant of good faith and fair dealing can be used to rewrite a contract.

> It is fundamental that every contract imposes a duty on the parties to exercise their contractual rights and perform their contractual obligations reasonably and in good faith. Nonetheless, a court may not make a better contract for the parties than they have made for themselves; furthermore, a court may not enforce asserted rights not supported by the contract itself. "[I]t cannot be adopted as a general precept of contract law that, whenever one party to a contract can show injury flowing from the exercise of a contract right by the other, a basis for relief will be somehow devised by the courts."

*Id.* at 970–71 (quoting *Mann v. American W. Life Ins. Co.*, 586 P.2d 461, 464 (Utah 1978) (citations omitted)).

In *Woodland Theatres, Inc. v. ABC Intermountain Theatres, Inc.*, 560 P.2d 700 (Utah 1977), the Utah Supreme Court examined how a court should interpret and enforce an implied covenant:

> An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it and therefore omitted to do so; or it must appear that it is necessary to infer

such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole.

*Id.* at 703 (quoting *Percoff v. Solomon*, 67 So.2d 31, 40 (Ala.1953)). The court further stated that "[w]hile we must enforce the lease in accordance with the intent of the parties, we must find that intent from the language of the lease itself, especially when it is clearly expressed." *Id.* (quoting *Flowers v. Wrights, Inc.*, 119 Utah 378, 383, 227 P.2d 768, 771 (1951)). The court also noted that "[a]n express covenant on a given subject matter excludes the possibility of an implied covenant of a different or contradictory nature." *Id.*

In the present case, the Use Clause in the lease provided:

> Lessee may use the demised building for conducting therein the business of a supermarket, drug store and pharmacy *or any other lawful retail selling business not directly in conflict or competition with another major tenant in the shopping center.* Lessee's use as a supermarket, drug store and pharmacy shall be exclusive in the Center, so long as lessee operates as a supermarket, drug store or pharmacy.

(Emphasis added.) Under this express provision, and as recognized by the trial court, Smiths's operation of "any lawful retail selling business" would satisfy the provisions of the lease so long as the use did not compete with "another major tenant."

The trial court correctly held that Smiths complied with this express provision of the lease, as a matter of law, when it opened its Buy 'N Save store in the leased premises.[2] There is no dispute that the Buy 'N Save

---

**2.** Smiths initially sought permission from Olympus Hills to sublet the space to REI, a national chain of sporting goods stores. REI was also a lawful retail selling business that would not have directly competed with another major tenant. Olympus Hills refused Smiths's reasonable request to sublet the space.

store was a "lawful retail selling business" not in direct competition with "another major tenant" of the shopping center. Smiths complied with the express covenants of the Use Clause and, as a matter of law, there can be no implied covenants that are inconsistent. *See Seare*, 882 P.2d at 678–79. Since the express covenants or promises did not require Smiths to operate anything more than a "lawful retail selling business" that did not compete with another major tenant, there could be no implied covenants or promises compelling Smiths to do otherwise. *Id.* Therefore, I would hold that the trial court erred in denying Smiths's motion for summary judgment on the issue of the implied covenant of good faith and fair dealing.

Because the main opinion erroneously upholds the trial court's denial of Smiths's motion for summary judgment on the covenant of good faith and fair dealing, it also erroneously upholds the trial court's decision to admit evidence going to the alleged breach of the covenant of good faith and fair dealing. Specifically, the trial court erroneously allowed the following evidence to be admitted: (1) evidence that traffic counts at the shopping center were sixty-percent lower after Smiths's change of use; (2) evidence that another business in the shopping center was adversely affected by Smiths's change of use; and (3) evidence that the highest and best use of the premises was as a full-service supermarket.[3] The trial court admitted this evidence on the ground that it was relevant to determine whether Smiths had breached its covenant of good faith and fair dealing. Smiths correctly argues that this evidence was both irrelevant and highly prejudicial because it allowed the jury to evaluate the decision to open its Buy 'N Save store from the perspective that Smiths had the duty act to as an "anchor tenant" in order to benefit all tenants of the shopping center.

In *Woodland Theatres,* the plaintiff argued that the lessee had an implied duty "to operate the theatre in a prudent, diligent, and businesslike manner; so as to maximize the revenue with resulting benefit to lessor . . . ." 560 P.2d at 701. The supreme court rejected the plaintiff's argument as being contrary to express provisions in the lease.

The lease instrument itself throughout paragraph 2, by its express provisions, clearly negates the implied covenant urged by lessor. In describing the designated percentage of the gross admission receipts and gross concession receipts, as well as the means of computation and time of payment, the contract repeats four times the term "if any" to indicate that there was no express representation the lessee would conduct a sufficient volume of business to guarantee payment. If there were any doubt as to the intention of the parties an express provision of the instrument clarifies the matter.

"The lessee in no way guarantees that there shall be any percentage rental earned and due and payable under the terms and conditions of this Lease."

An express covenant on a given subject matter excludes the possibility of an implied covenant of a different or contradictory nature. The lessor's asserted implied covenant cannot be sustained, in view of the foregoing express provision.

*Id.* at 703 (citations omitted).

The lease in the present case expressly provided that "[l]essee makes no representation or warranty as to the sales which it expects to make in the leased premises." This provision is similar to that in *Woodland Theatres.* Smiths expressly disavowed any representation or warranty as to the level of sales it would make in the leased premises.

---

3. The main opinion rewrites the contract to include a "reasonable" economic use provision, and then holds that the Buy 'N Save was not such a use and that Smiths therefore breached its duty of good faith and fair dealing. Perhaps, in retrospect, the Buy 'N Save was not the best economic use of the leased premises. However, this fact, whether accurate or inaccurate, is immaterial. Nothing in the lease mandates that Smiths make the best possible use of the premises. The main opinion goes on to hold that the "highest and best use" of the premises was a full-service supermarket rather than a discount supermarket. The lease, however, does not require Smiths to operate a supermarket of either type. The unambiguous language of the lease simply does not support the main opinion's position. *Woodland Theatres,* 560 P.2d at 703 ("An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself").

It was therefore not reasonable, as the main opinion suggests, for Olympus Hills to expect that Smiths would operate as an "anchor tenant" and thereby benefit all other tenants.

If Olympus Hills wanted Smiths to operate a particular kind of business with a certain volume of customers it could have so specified in the lease. It did not do so. The parties are now bound by the contract they signed, and the contract should not be re-written by a court merely because one of the parties to the contract is dissatisfied with its bargain. *See Brown,* 753 P.2d at 970–71 ("a court may not make a better contract for the parties than they have made for themselves.... '[I]t cannot be adopted as a general precept of contract law that, whenever one party to a contract can show injury flowing from the exercise of a contract right by the other, a basis for relief will be somehow devised by the courts.'") (quoting *Mann,* 586 P.2d at 464).

### (2) Unlawful Detainer

Two weeks after the notice of unlawful detainer or termination, Olympus Hills accepted and negotiated Smiths's rental check. Smiths argues that by accepting rent, Olympus Hills waived any defaults of which it had knowledge. I agree.

The main opinion recognizes that acceptance of rent payments constitutes a waiver of a claim for breach under Utah law. *See Girard v. Appleby,* 660 P.2d 245, 248 (Utah 1983); *Woodland Theatres,* 560 P.2d at 701. The main opinion attempts to avoid this controlling precedent by relying on cases from other jurisdictions that have held otherwise.

In *Woodland Theatres,* the Utah Supreme Court addressed the question of whether acceptance of rent payments waved the lessor's right to enforce a forfeiture. The court stated:

> Where, by reason of a breach of a condition, a lease becomes forfeited, the lessor is entitled to recover possession. He waives that right by the acceptance of rent. He cannot accept the rent, and at the same time claim a forfeiture of the lease.

*Id.* (quoting *Brigham Young Trust Co. v. Wagener,* 13 Utah 236, 241, 44 P. 1030, 1031 (1896)). The court further stated:

> A landlord seeking enforcement of a forfeiture must take care not to do anything which may be deemed an acknowledgement of a continuation of the tenancy. Any act done by a landlord knowing of a cause for forfeiture by his tenant, affirming the existence of the lease and recognizing the lessee as his tenant, is a waiver of such forfeiture.

> If the lessor receives rent from the lessee after full notice or knowledge of the broken covenant or condition, he cannot thereafter assert his rights of forfeiture given by the lease, notwithstanding express denial of the waiver upon acceptance of the rent.

*Id.* 560 P.2d at 702 (quoting 3A Thompson On Real Property (1959 Replacement), Sec. 1328, p. 576). The court concluded that since the lessor accepted rental payments after the default, the lessor was precluded from seeking forfeiture. *Id.*

In the present case, where Olympus Hills accepted and negotiated a rent check after filing a notice of default, it is precluded, as a matter of law, from seeking damages for unlawful detainer.

### CONCLUSION

I would hold that Smiths complied with the express provisions of its lease with Olympus Hills and was entitled to judgment, as a matter of law, on Olympus Hills's claim for breach of the covenant of good faith and fair dealing. I would also hold, as a matter of law, that Olympus Hills's acceptance of a rent check waived its right to seek damages for unlawful detainer.