**2024 UT App 67**

# THE UTAH COURT OF APPEALS

OLÉ MEXICAN FOODS INC.,
*Appellant,*
*v.*
J & W DISTRIBUTION LLC AND MERLENE BILLS,
*Appellees.*

Opinion
No. 20220982-CA
Filed May 9, 2024

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 199911799

E. Scott Savage and Stephen R. Waldron,
*Attorneys for Appellant*

Scarlet R. Smith and Jack D. Smart,
*Attorneys for Appellees*

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred, with the
exception of Footnote 4. JUDGE OLIVER authored a separate
opinion regarding that footnote, in which JUDGE TENNEY joined.

HARRIS, Judge:

¶1     This case involves a contract dispute between two
companies in Utah's tortilla supply chain: Olé Mexican Foods Inc.
(Olé), a tortilla manufacturer, and J & W Distribution LLC (J&W),
a food distributor. After the two companies sued each other and
went to trial, a jury determined that Olé owed J&W $140,000.
Following the verdict, the trial court determined that J&W was the
prevailing party and awarded J&W attorney fees pursuant to the
parties' contract. The court then entered judgment for J&W. Olé
filed a motion for a new trial, asserting that the jury verdict was
internally inconsistent and that the evidence did not support the

jury's damages award. The trial court rejected Olé's arguments and denied the motion.

¶2 On appeal, Olé challenges the trial court's denial of its post-trial motion as well as the court's attorney fees award. With regard to the verdict, Olé continues to maintain that the jury answered the special verdict form's questions in a logically inconsistent way, and that the damages award was not supported by the evidence. With regard to attorney fees, Olé asserts that the parties' contract does not actually provide for recovery of attorney fees, and it contends that in any event J&W was not the prevailing party. We reject all of Olé's arguments and therefore affirm.

BACKGROUND[1]

¶3 Olé is a large corporation, headquartered in Georgia, that produces corn and flour tortillas, among other products. Olé's customers are located all over the country and include grocery stores and other food retailers. For dissemination of its products to its customers, Olé typically relies on "independent distributors," one of whom was, for a time, J&W.

¶4 J&W was a small Utah company founded by two brothers (Justin and Wade), assisted at times by their mother, Merlene Bills (Merlene).[2] Wade was friends with one of Olé's managers (Manager), and J&W was created primarily to act as Olé's Utah

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *Commercial Club Bldg. LLC v. Global Rescue LLC*, 2023 UT App 37, n.2, 529 P.3d 382 (quotation simplified).

2. Because these three individuals share a last name, we refer to them by their first names for clarity, with no disrespect intended by the informality.

distributor. At its peak, J&W had eleven employees, and Olé was by far J&W's biggest client.

¶5      In 2010, Olé and J&W began doing business together, and just weeks into their business relationship they executed a written contract captioned "Distributor Agreement" (the Agreement). In addition, Wade and Merlene both signed personal guarantees, each committing to personally cover J&W's obligations to Olé. Wade passed away in 2011, leaving Merlene as the sole personal guarantor of J&W's obligations.

¶6      In theory, J&W would purchase tortillas (often on credit) from Olé and then resell them to its customers at whatever price J&W was able to negotiate. But in practice, it worked this way only for a couple of J&W's very small "cash" customers. For Walmart and Smith's—J&W's two largest customers—Olé would bill the customer directly, and it would account for the transaction by charging J&W's credit account with a "distributor" price that was lower than the price paid by Walmart or Smith's. The difference between the distributor price charged to J&W and the higher price paid by Walmart or Smith's would be logged as a "credit" on J&W's account with Olé, and over time, this was designed to build up a positive balance on J&W's account. Olé would then periodically pay J&W the amount showing as a positive balance on the credit account. These payments were often referred to as "margin checks" or "commissions."

¶7      For the first three years of the companies' relationship, things proceeded relatively smoothly. But in 2013, Olé informed J&W that, in its view, J&W had accumulated a negative balance in its credit account of about $80,000. J&W did not think it owed Olé anything, and it believed that Olé had simply made an accounting mistake. J&W "asked [Olé] to provide the information that shows" the debt, and Olé said it would "get that information to" J&W. In the meantime, and in an effort to keep what had theretofore been a lucrative business relationship on good terms,

Justin offered to pay Olé $40,000 "right now" and asked to "sit down" with Olé and "find out if this is true or not." To this end, Justin agreed that Olé could "deduct" an additional $2,000 to $3,000 per week from J&W's credit account as a method of paying the $40,000 he had agreed J&W would pay.

¶8     Just a few weeks later, however, Olé informed J&W that, rather than $80,000, J&W's negative account balance was actually $850,000. This "did not make sense" to Justin; after all, $850,000 represented an entire "year's worth of product." Justin asked Olé for clarification and requested specific documentation for this large negative balance, but Olé was not able to provide proof of the debt in a way that made sense to Justin. Later, Justin asked Manager for an explanation, and Manager offered his view that Olé would not be able to show that the debt was actually owed because its accounting system had recently experienced technical issues, including a malware attack.

¶9     Over the next two years, Olé attempted to convince J&W that the negative balance was real. Olé asserted—variously—that J&W might have been allowing products to expire or that someone might have been taking tortillas from J&W's warehouse. At one point, Olé sent J&W a spreadsheet indicating that Olé was charging J&W for things like "chorizo, pastries, [and] cheeses"— items that J&W had never purchased or sold because it did not have a refrigerated warehouse. J&W disputed all of Olé's theories as to how the large negative balance had accrued.

¶10     As time went by, Olé believed that the debt was not being paid down fast enough, and it began to increase the weekly deduction from $2,000 or $3,000 up to $5,000. There is no indication that J&W approved of or authorized any of these larger deductions. Through weekly deductions over the course of nearly two years, Olé deducted a total of some $350,000 from J&W's credit account. This was a significant amount of money for a small company like J&W, and eventually J&W notified Olé that the extra

deductions were bringing it to "a shutdown point." The two companies were never able to work out a solution to the problem and, in 2015, they severed their business relationship. J&W went out of business about two months later.

¶11    In 2016, Olé sued J&W and Merlene. Olé's complaint was short, containing just seven paragraphs; therein, Olé asserted that J&W had breached its contractual obligations to Olé, that Merlene had guaranteed J&W's obligations, and that J&W and Merlene, jointly and severally, owed Olé $499,217.03. Olé also asked the court to award it reasonable attorney fees. Justin and Merlene jointly filed a pro se answer, denying Olé's claims, and the parties exchanged some preliminary information. But Olé did little to move the case forward and, about two years later, the judge assigned to the case dismissed the lawsuit, without prejudice, for failure to prosecute.

¶12    In 2019, just under a year later, Olé filed the instant lawsuit, again suing J&W and Merlene. Olé used the same seven-paragraph complaint it had filed in its previous lawsuit, and it asked for the same relief. Along with the complaint, Olé submitted a two-page document entitled "Statement of Account." That document contains thirty-one separate line-item charges and credits, all occurring between August and December 2014, that add up to $499,217.03.

¶13    Following the filing of Olé's complaint, J&W and Merlene[3] answered—this time, with counsel—and denied Olé's claims. J&W also filed a counterclaim against Olé in which it stated four separate causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of

---

3. From this point forward, we will refer to J&W and Merlene collectively as "J&W" for purposes of describing their combined actions in the litigation. We will continue to refer to them individually as needed in other contexts.

implied contract, and (4) unjust enrichment. It asserted in the counterclaim that Olé failed to pay, and improperly withheld, more than $325,000 worth of commission payments it was contractually bound to pay. J&W asked for an award of damages in that amount, as well as an award of attorney fees and costs.

¶14 The parties soon exchanged initial disclosures. But after that, no action was taken in the case, by either party, for more than sixteen months. Neither side asked to, nor did, conduct discovery of any kind, and neither side designated any expert witnesses.

¶15 In April 2021, J&W filed a motion asking the trial court to dismiss Olé's lawsuit for failure to prosecute, and it asked that the dismissal, this time, be with prejudice. Olé responded by opposing J&W's motion and, in addition, filing a certificate of readiness for trial in which it represented that "discovery [was] completed" and that "the case [was] ready for trial." At a hearing held a few weeks later, the court denied J&W's motion to dismiss and scheduled a jury trial to take place in early 2022.

¶16 After one continuance, the trial took place over four days in April 2022. Three witnesses testified in Olé's case-in-chief, all of whom were employees of Olé during the relevant time period. Justin and Merlene were the only witnesses to testify for J&W. These witnesses testified regarding the events described above. Also during the trial, while neither side called a retained expert, both sides introduced into evidence various ledgers and accountings purporting to set forth each side's view of how the debts and obligations should be computed. The ledgers were voluminous, and they contained weekly invoices spanning almost two years and displaying hundreds of line-item transactions. While the parties disagreed about computation and accounting issues, they agreed—and their respective exhibits showed—that the debts and obligations at issue were not monolithic but, instead, were composed of numerous individual transactions,

over the course of nearly two years, in which tortillas were purchased and sold.

¶17    On the last full day of the trial, several issues arose regarding the jury instructions and the special verdict form. One issue concerned whether there was just one contract, or instead a series of contracts, that governed the parties' relationship. After discussion, the parties agreed that, at least for the purposes of one particular jury instruction, the court should speak in terms of whether "*a* contract" had been breached rather than whether "*the* contract" had been breached. (Emphasis added.) Later, the court incorporated this concept into many of the other jury instructions as well as the special verdict form.

¶18    Also, during discussion regarding jury instructions and the verdict form, the subject of J&W's claim for breach of the implied covenant of good faith and fair dealing arose. The court noted that the parties, in their set of proposed stipulated jury instructions, had included an instruction regarding the implied covenant that was drawn from the Model Utah Jury Instructions. *See* Model Utah Jury Instructions 2d CV2119, https://legacy.utcourts.gov/muji/?cat=1&subcat=21 [https://perma.cc/CG7D-FEQS]. Based on that stipulation, the court decided to give this instruction to the jury, thus informing it (among other things) that "[a]ll contracts contain an unwritten or implied promise that the parties will deal with each other fairly and in good faith," and that, by this implied promise, the parties "have promised not to intentionally do anything to injure each other's right to receive the benefits of the contract." However, the jury was told that "this unwritten promise . . . does not establish new, independent rights or duties" that the parties "did not agree to" or that are "inconsistent with the actual terms of the contract." The jury was also instructed that it could not "use this unwritten promise to achieve an outcome that [it believes was] fair but is inconsistent with the actual terms of the contract." Finally, the jury was told that, if it were to conclude that "a party violated this unwritten

promise to deal fairly and in good faith, then that party breached the contract."

¶19    But during the discussion with the attorneys regarding the instructions and the verdict form, the court also noted that, while the parties had apparently stipulated to the jury instruction regarding the implied covenant, neither party had—in their respective versions of a proposed special verdict form—asked for a separate line or question regarding any claim for breach of the implied covenant. The court therefore inquired as to whether either party wanted such a question included on the verdict form. In response, J&W indicated that it did want such a question included on the verdict form, but Olé indicated that it did not, asserting that the implied covenant was "just another term of the contract" and that questions about its breach were implicitly included in any general question asking about breach of contract. Olé's attorney specifically asserted that there should not be a separate damages line on the verdict form for breach of the implied covenant because "they're both breach[es] of contract[]" and J&W couldn't "get more damages for one than the other." After making sure that J&W had in fact included a claim for breach of the implied covenant in its counterclaim, the trial court decided to include a separate question on the verdict form regarding breach of the implied covenant, offering its view that "[y]ou could have breach of . . . an express term or breach of the implied covenant." However, the court decided not to include a separate damages line for J&W's claim for breach of the implied covenant, ultimately including just one line on the verdict form for total contract damages. In the end, the relevant portion of the special verdict form looked like this:

> **Question (7)**: Did Olé Mexican Foods breach a contract with J&W Distribution?

**Question (8)**: Did Olé breach the implied covenant of good faith and fair dealing inherent in a contract with J&W?

If you answered YES to EITHER OR BOTH Questions 7 & 8, proceed to Question 9. If you answered NO to BOTH Questions 7 & 8, STOP here, have the foreperson sign the form and notify the Bailiff.

**Question (9)**: Did J&W suffer damages because of Olé Mexican Foods' breach?

¶20 After three full days of testimony, the court instructed the jury, the attorneys provided closing argument, and the jury began its deliberation. The jury deliberated into the evening and, after being adjourned for the night, resumed its deliberation the following day. After another six hours in the jury room, the jury finally issued its verdict. It first determined—in the first question on the verdict form—that J&W had not "breach[ed] a contract with" Olé, thereby finding against Olé on its affirmative claim for breach of contract. With regard to J&W's counterclaim, the jury answered Question 7 in the negative, finding that Olé had not "breach[ed] a contract with J&W." But the jury answered Question 8 in the affirmative, finding that Olé had in fact breached the implied covenant "inherent in a contract with J&W." And as for Question 9, the jury found that J&W had suffered $140,000 in damages because of Olé's breach.

¶21 The record submitted to us on appeal does not include a transcript of the trial's fourth day—the one on which the jury rendered its verdict. But the court's minute entry indicates that, while the jury was "polled," no party took the position—at least not during the time the jury remained empaneled—that the jury's verdict was inconsistent, and no party asked the court to order the jury to clarify its verdict.

¶22    A few weeks later, after the parties had briefed issues related to prejudgment interest, the court entered judgment in J&W's favor. The court's initial judgment, entered in June 2022, awarded J&W a total of $234,318 ($140,000 plus $94,318 in prejudgment interest).

¶23    After entry of the judgment, each party filed one motion of note. J&W sought recovery of attorney fees, asserting that the Agreement provided for such recovery. For its part, Olé opposed J&W's attorney fees motion and, in addition, filed a motion for a new trial in which it asserted (among other things) that the jury's verdict was "inconsistent" and that its damages award to J&W was "without any evidentiary support."

¶24    After briefing and argument, the court denied Olé's motion for a new trial and granted J&W's motion for attorney fees. Regarding Olé's motion, the court determined that the jury's verdict was "not inconsistent" and that there was "a reasonable basis in evidence" for the damages award. And regarding J&W's motion, the court determined that section 4.3 of the Agreement—which provides that "the non-prevailing party" in "any action . . . to enforce" the Agreement "shall pay the prevailing party all costs, expenses, and actual attorney's fees incurred"—called for an award of attorney fees to J&W, whom the court found to be the prevailing party in the litigation. The court also quantified J&W's attorney fees, concluding that J&W had incurred $120,830.50 in reasonable fees during trial and another $14,496.68 during post-judgment proceedings. The court then entered an augmented judgment that required Olé to pay J&W a total of $369,645.18, inclusive of prejudgment interest and attorney fees.

ISSUES AND STANDARDS OF REVIEW

¶25    Olé now appeals, and it raises two issues for our review. First, it challenges the court's denial of its motion for a new trial. As a general matter, "a trial court's decision to grant or deny a

motion for a new trial is reviewed for an abuse of discretion." *Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 30, 502 P.3d 320 (quotation simplified), *cert. denied*, 509 P.3d 768 (Utah 2022). But as we have explained, our standard of review in this context is often more nuanced than that, depending on the specific grounds upon which a new trial was sought, and depending on whether the party is challenging the trial court's determination as to whether a trial impropriety occurred at all or is, instead, challenging the court's determination as to whether the identified error required a retrial. *Id.* ¶¶ 31–32.

¶26  In this instance, Olé's challenge to the trial court's denial of its motion for a new trial contains two constituent parts: it first asserts that the trial court incorrectly concluded that the jury's verdict was not internally inconsistent, and it additionally contends that the trial court erred in concluding that the jury's damages award was supported by sufficient evidence. As to the first of these issues, we review the trial court's determination for correctness. *See Tooele Assocs. Ltd. P'ship v. Tooele City*, 2012 UT App 214, ¶ 9, 284 P.3d 709 ("We review for correctness a trial court's determination of whether a special verdict is inconsistent."), *cert. denied*, 293 P.3d 376 (Utah 2012). As to the second of these issues, we review the trial court's determination for abuse of discretion. *See ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 22, 309 P.3d 201 (stating that "[t]he district judge who presided over a trial is in a far better position than an appellate court to determine, for example, whether the evidence was sufficient to justify the verdict," and reviewing the denial of a motion for a new trial in this context for abuse of discretion).

¶27  Olé's second challenge is to the trial court's attorney fees award. In this vein, Olé asserts that the Agreement does not provide for recovery of fees at all and that, even if it did, J&W was not the prevailing party. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10,

¶ 26, 543 P.3d 1264 (quotation simplified). However, "when a contract dictates that fees should be awarded to the prevailing party, the question of which party prevailed depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court." *Id.* (quotation simplified).

## ANALYSIS

### I. The Motion for a New Trial

¶28   Olé's challenge to the court's ruling denying its motion for a new trial has two parts. First, Olé asserts that the jury's verdict was internally inconsistent. Second, Olé claims that the jury's damages award was not supported by sufficient evidence. We address these arguments in turn.

### A

¶29   Olé's first argument—that the jury's verdict was internally inconsistent—raises a potential ground upon which a court, in appropriate cases, may order that a new trial take place. *See* 66 C.J.S. *New Trial* § 111 (2024) ("A new trial may be granted on the ground that the verdict is internally contradictory, inconsistent, or irreconcilable[,] . . . or that special findings are inconsistent or irreconcilable with each other or with the general verdict."); *see also* Utah R. Civ. P. 59(a)(1) (stating that "a new trial may be granted . . . for . . . irregularity in the proceedings of the court [or] jury"). But new trials are expensive and time-consuming, and they should not be ordered unless necessary to remedy a bona fide mistake or irregularity in the proceedings. For this reason, Utah courts apply something of a two-tier framework—depending on *when* the alleged inconsistency is brought to the attention of the trial court—in cases in which a party requests relief on the basis of an allegedly inconsistent verdict.

¶30 Relief is more easily obtained if a party brings the alleged inconsistency to the attention of the trial court *before* the jury has been released from service. At that point, with the jury still empaneled, "the body that rendered the verdict remains available for consultation," and a court "can simply ask the jury what it meant." *See KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 36, 436 P.3d 151. In light of this reality, a trial court to whom a potential inconsistency is brought while the jury remains empaneled is given a wider "measure of discretion in determining whether inconsistencies are present in a particular verdict." *See id.* ¶ 37. In that situation, the court "may seek the jury's input if the jury's answers are potentially inconsistent, or are inconsistent under any reasonable view." *Id.* ¶ 39.

¶31 The rule is different, however, if the potential inconsistency is first brought to the court's attention only *after* the jury has been released from service. In that situation, courts have a "strict duty" to "reconcile potentially inconsistent answers on a special verdict form, if possible." *Id.* ¶ 32; *see also Neff v. Neff*, 2011 UT 6, ¶ 76, 247 P.3d 380 ("Where the possibility of inconsistency in jury interrogatories or special verdicts exists, we will not presume inconsistency; rather, we will seek to reconcile the answers if possible." (quotation simplified)). In reviewing post-discharge claims that a jury verdict is inconsistent, courts "must accept any reasonable view of the case that makes the jury's answers consistent." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 852 (10th Cir. 2000) (quoted in *Neff*, 2011 UT 6, ¶ 49 n.20); *see also KTM Health*, 2018 UT App 152, ¶ 32 (stating that, "rather than reconvene a new jury and put the parties and the court to the time and expense of a second trial," courts asked to consider a potential inconsistency after jury discharge "should of course make every effort to view the special verdict form in a way that permits each of the answers to be reconciled with the others"). If it is possible for a court to read the verdict form "harmoniously," the "verdict will be sustained, even in the face of possible inconsistency." *See Neff*, 2011 UT 6, ¶ 76 (quotation simplified). The question

presented, in such cases, "is whether it is reasonable to construe the jury's verdict . . . in a manner that gives effect to all of the jury's responses on the special verdict form." *Id.* If the verdict form can plausibly and reasonably be interpreted consistently, "we are bound to adopt [that] construction," even if other reasonable interpretations exist. *Id.* ¶ 85.

¶32 In this case, Olé did not bring any potential inconsistency in the verdict to the trial court's attention while the jury remained empaneled. We are therefore obligated, pursuant to our "strict duty," to reconcile the jury's answers on the special verdict form if possible. *See KTM Health*, 2018 UT App 152, ¶ 32. Thus, if any reasonable interpretation of the jury's verdict exists that allows us to reconcile the jury's answers, we are bound to adopt that interpretation. And in our view, one such reasonable interpretation exists here.

¶33 Olé's arguments regarding inconsistency revolve around the jury's answers to Questions 1, 7, 8, and 9. In Question 1, the jury found that J&W did not breach a contract with Olé. In Question 7, the jury found that Olé did not breach a contract with J&W. In Question 8, the jury found that Olé breached the implied covenant of good faith and fair dealing inherent in a contract with J&W. And in Question 9, the jury determined that J&W had suffered $140,000 in damages as a result of Olé's breach. As we understand it, Olé makes two arguments that these answers are necessarily inconsistent, neither of which we consider persuasive.

¶34 First, Olé asserts that the jury's answers to Questions 7 and 8 are necessarily inconsistent. It points out—correctly—that a breach of the implied covenant is simply a breach of contract. *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193 ("A violation of the [implied] covenant is a breach of the contract."). From this premise, Olé reasons that the jury's answer to Question 7—that Olé had not breached a contract with J&W—must necessarily have included the subsidiary conclusion that Olé had

not breached the implied covenant of good faith and fair dealing; under this interpretation, the jury's answer to Question 7 is inconsistent with the jury's answer to Question 8.

¶35   Olé's position makes logical sense and constitutes one reasonable way to interpret the jury's answers. After all, if a breach of the implied covenant is simply one species of breach of contract, then a conclusion that no breach of contract occurred could logically include the notion that no breach of the implied covenant occurred either.

¶36   But in our view, this is not the only reasonable way to interpret the jury's answers to Questions 7 and 8. In Utah, a practice has arisen of pleading a claim for breach of the implied covenant separately from a general claim for breach of contract. This practice may have grown out of this court's statement, some three decades ago, that "breach of the implied covenant of good faith and fair dealing is an independent cause of action." *See Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 457 n.12 (Utah Ct. App. 1994), *cert. denied*, 899 P.2d 1231 (Utah 1995).[4] When a claim for breach of contract is

---

4. (In this footnote, Judge Harris is speaking only for himself. *See infra* ¶¶ 59–61.) There exists some apparent tension between our statement that a claim for breach of the implied covenant "is an independent cause of action," *see Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 457 n.12 (Utah Ct. App. 1994), *cert. denied*, 899 P.2d 1231 (Utah 1995), and our supreme court's statement that "[a] violation of the [implied] covenant is a breach of the contract," *see Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193. Perhaps, at some point in the future, our supreme court will provide additional guidance on the matter. In the meantime, I would encourage litigants to consider whether it is truly necessary to include in their complaints a separate cause of action, in addition to a general claim for breach

(continued…)

pleaded separately from a claim for breach of the implied covenant—as J&W pleaded its counterclaim here—one plausible way to interpret the pleading is to construe the breach of contract claim as seeking relief for breaches of express terms of the contract, and to construe the claim for breach of the implied covenant as seeking relief only for breaches of that particular implied provision. During trial, the court construed J&W's counterclaim in exactly this manner, and it determined to both (a) give a separate jury instruction regarding the implied covenant, and (b) include a separate question on the verdict form for J&W's separate claim for breach of the implied covenant.[5]

---

of contract, for breach of the implied covenant of good faith and fair dealing. This case is an example of how pleading those claims separately can lead to confusion. In my view, it would—at least in most cases—be simpler and cleaner for litigants to abandon the practice of pleading claims for breach of the implied covenant separately from claims for breach of other (express) provisions of the same contract. After all, a plaintiff who believes that a defendant breached, say, three different *express* contractual terms generally has no need to state three separate claims for breach of contract in the complaint; that plaintiff can simply describe, in the complaint's general breach cause of action or in initial disclosures or elsewhere, which contractual provisions it believes have been violated. In my view, this same procedure can and should be employed even if one of the allegedly violated contractual terms is the implied covenant.

5. During the discussion about the jury instructions and the verdict form, Olé objected to the court's inclusion, on the verdict form, of a separate question for breach of the implied covenant. But on appeal, it does not specifically challenge the court's decision to include that separate question on the verdict form. While its appellate briefs do include some discussion of the

(continued…)

¶37 The trial court applied this same interpretation when assessing the merits of Olé's post-trial inconsistency argument. It considered the instructions the jury had been given regarding breach of contract and breach of the implied covenant, including the instruction that the implied covenant was "an unwritten or implied promise," and including the warnings that the implied covenant did not create new "rights and duties that are inconsistent with the actual terms of the contract" and that the jury "cannot use this unwritten promise to achieve an outcome that [it believed was] fair but is inconsistent with the actual terms of the contract." Against this backdrop, the court concluded that "the jury understood that breach of a contract meant breach of the actual agreed-upon terms, and breach of the implied covenant meant breach of the unwritten covenant imbued into each contract," and that the "jury's answers to Questions 7 and 8" are therefore "not inconsistent."

¶38 Olé takes issue with this interpretation, asserting that Question 7 did not include the word "express" and contending that, without inclusion of this word, the jury could not reasonably have construed the verdict form in this manner. We disagree. Question 8 included the word "implied," and so did the jury instruction regarding the implied covenant; the inclusion of that word in Question 8, and the accompanying exclusion of that word from Question 7, supports the court's interpretation. *Cf. Tooele Assocs. Ltd. P'ship v. Tooele City*, 2012 UT App 214, ¶¶ 15–19, 284 P.3d 709 (concluding that, because one breach-of-contract question on the verdict form used the word "material" and another did not, the jury could have consistently answered "no"

---

asserted impropriety of the court's decision to include that question on the verdict form, that discussion is intended only to bolster Olé's argument that the jury's answers were inconsistent. We therefore do not need to directly confront any argument that the trial court committed reversible error by including a separate question for the implied covenant on the verdict form.

to one question and "yes" to the other), *cert. denied*, 293 P.3d 376 (Utah 2012). While we acknowledge that it would have been better, and would have made the verdict form less ambiguous, for Question 7 to have specified that it was asking about breach of express terms, the absence of the word "express" from Question 7 does not render the trial court's interpretation unreasonable.

¶39    As we see it, the court's interpretation of the verdict form—while by no means the only possible one—is reasonable, especially given the way the claims were pleaded and the way the jury was instructed. The jury certainly *could have* understood that Question 7 was aimed at whether Olé had breached the express terms of the parties' contracts, and that Question 8 was aimed at whether Olé had breached the covenant of good faith and fair dealing implied by force of law into those contracts. And given the procedural posture here—where Olé raised the potential inconsistency *after* the jury had been discharged—we are bound to adopt any reasonable interpretation. And if we assume that the jury interpreted Questions 7 and 8 in this manner, their answers to those questions are not at all inconsistent.[6]

---

6. Olé also directs our attention to two out-of-state cases that it believes support its assertion that the jury's answers to Questions 7 and 8 were inconsistent. *See Wade v. Kessler Inst.*, 798 A.2d 1251 (N.J. 2002); *Story v. City of Bozeman*, 791 P.2d 767 (Mont. 1990), *overruled by Arrowhead School Dist. No. 75 v. Klyap*, 2003 MT 294, 79 P.3d 250. We do not consider these cases to be as helpful here as Olé does. As an initial matter, these cases do not involve Utah law, which we must of course follow, including our previous statement that "breach of the covenant of good faith and fair dealing is an independent cause of action," *see Olympus Hills*, 889 P.2d at 457 n.12, and including our "strict duty" to reconcile the jury's answers if possible, *see KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 32, 436 P.3d 151. Moreover, these
(continued…)

¶40     Second, Olé asserts that the jury's answers to Questions 1 and 9 are necessarily inconsistent. In answer to Question 1, the jury found that J&W had not breached a contract with Olé. And in answer to Question 9, the jury found that J&W had suffered $140,000 in damages as a result of Olé's breach of the implied covenant of good faith and fair dealing. Olé asserts that these answers are inconsistent, pointing out that J&W had argued to the jury that it was owed $350,000 from Olé, and reasoning that "[i]n order to find that Olé owed J&W $140,000 under any contract, the jury would have to have decided that J&W, in fact, owed Olé $210,000" (the difference between $350,000 and $140,000) for contractual breaches committed by J&W. Again, this is not an unreasonable interpretation of the jury's answers. But it is also not the only reasonable interpretation.

¶41     It is at least equally plausible that the jurors simply netted out the figure they believed Olé owed J&W. If the jury concluded that Olé had properly withheld $210,000 from J&W's commission checks, but had improperly withheld the remaining $140,000, it is perhaps *technically* true that this conclusion necessarily includes a subsidiary finding that J&W violated the terms of the parties' contractual arrangement. But the jury was instructed—correctly—that proof of damages is one of the four essential elements of a breach of contract claim. *See Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 29 n.26, 508 P.3d 84 (stating that there are four "elements of a prima facie case for breach of contract," including "damages" (quotation simplified)). The jury could reasonably have concluded that J&W violated the terms of the parties' contractual arrangement by failing to pay Olé $210,000, but that Olé had not established the elements of a breach

_____

two cases are distinguishable in other ways. For instance, the trial court in *Story* included two separate lines for contract damages on the verdict form, one for general contract damages and one for bad faith, whereas the verdict form here—correctly—included just one line for all contract damages. *See* 791 P.2d at 770–71.

of contract cause of action because Olé had already recouped that $210,000 (and then some) through its weekly withholdings. Under this scenario, the correct answer to Question 1 is to find that Olé had not succeeded on its claim against J&W for breach of contract. And in that event, the jury's answer to Question 1 is entirely consistent with its answer to Question 9.

¶42    For these reasons, we discern no error in the trial court's determination that the jury's answers to the questions on the special verdict form were not necessarily inconsistent. The trial court was obligated to indulge any reasonable consistent interpretation of the verdict form, and so are we. Because such an interpretation exists, the trial court correctly denied that portion of Olé's motion for a new trial that was premised upon an argument that the jury's verdict was inconsistent.

B

¶43    Second, Olé asserts that the jury's damages award— $140,000 in contract damages for Olé's breach of the implied covenant of good faith and fair dealing—was not supported by sufficient evidence. The trial court rejected this argument, and we discern no abuse of discretion in that determination.

¶44    "Juries are generally allowed wide discretion in the assessment of damages." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 71, 372 P.3d 629 (quotation simplified). While this truism is often recited in tort cases, *see, e.g.*, *Judd v. Drezga*, 2004 UT 91, ¶ 62, 103 P.3d 135 (Durham, J., dissenting), it is the law in contract cases as well, *see USA Power*, 2016 UT 20, ¶ 71; *see also Cornia v. Wilcox*, 898 P.2d 1379, 1382–86 (Utah 1995) (stating, in a case asserting breach of "written pasture agreements," that "juries are generally allowed wide discretion in the assessment of damages" (quotation simplified)).

¶45    It is sometimes said that, in contract cases, the question of damages will necessarily be an all-or-nothing exercise. *See* 22 Am.

Jur. 2d *Damages* § 48 (2024) (making an "[o]bservation" that "[c]ontract damages normally are awarded on an all-or-nothing basis"); *see also Stop Loss Ins. Brokers v. Brown & Toland Med. Group*, 49 Cal. Rptr. 3d 609, 620 (Ct. App. 2006) (Pollak, J., concurring) (same). But this observation is often made simply to indicate that the tort-based concept of apportionment of fault is inapplicable in contract cases. *See Stop Loss*, 49 Cal. Rptr. 3d at 620 (Pollak, J., concurring) (stating that there can be "no apportionment" of the damages amount in a contract case "even if less than perfect performance of the conditions by the nonbreaching party contributed in some measure to the loss"). Similarly, in other contract cases, there may exist only one alleged breach with an indivisible damages amount, and in such cases the damages question might necessarily involve, as a factual matter, an all-or-nothing inquiry. *See, e.g.*, *Duke Cap. LLC v. Proctor*, 2023 UT App 59, ¶¶ 3–4, 531 P.3d 745 (considering a case dealing with only one promissory note involving a certain amount).

¶46    In this case, by contrast, the parties' damages computations were anything but monolithic. Each side introduced into evidence various ledgers and accountings; these voluminous exhibits contained weekly invoices spanning almost two years and displaying hundreds of individual line-item transactions. And each side presented differing interpretations of these exhibits, with Olé contending that J&W owed it nearly $500,000, and J&W contending that Olé owed it $350,000. The number the jury selected—Olé owing J&W $140,000—lies comfortably within the $850,000-wide range of figures potentially supported by the evidence presented. A factfinder generally has discretion to select any figure within the range of numbers supported by the evidence. *See State v. Hunt*, 2018 UT App 222, ¶ 31, 438 P.3d 1 (noting that "the jury received expert testimony that the value of the stallions ranged between $0 and $16,000, and it selected a value within that range," and concluding on that basis that "the jury's conclusions as to value were supported by competent evidence"); *see also, e.g.*, *Amoss v. Broadbent*, 514 P.2d 1284, 1287

(Utah 1973) ("The compensatory damages assessed in this case were within the range of the evidence as to value."); *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896 (7th Cir. 1985) ("The jury apparently did not accept whole-cloth the view of either of the experts, and arrived at its figure independently (very possibly, we suspect, by splitting the difference). . . . Thus, a verdict for $1.1 million cannot be said to have no reasonable basis in the record: such a verdict is within the range of evidence presented to the jury, and we presume that the jury performed its responsibilities faithfully."); *Liberty Media Corp. v. Vivendi Universal, SA*, 923 F. Supp. 2d 511, 530–32 (S.D.N.Y. 2013) (upholding an award of "€765 million" when one party calculated damages at "€842 million" and another between "€0 and €175 million," because the jury had "any number of reasonable paths for arriving at a damages award of €765 million based on rough credibility determinations regarding the experts' calculations").

¶47 Olé asserts, however, that there is no basis in the evidence for the jury to have selected $140,000 as its damages figure. To be sure, no party argued at trial that the jury should adopt this figure, and none of the parties' exhibits contains any reference to this figure. We agree with Olé that it is not entirely clear where the jury got this figure.

¶48 But that does not make the jury's damages award unsupported by the evidence presented. As noted, the figure the jury chose lies within the range of numbers supported by the evidence. And the evidence indicated that damages, in this case, were not monolithic but, instead, were made up of hundreds of individual contractual transactions. The jury could have concluded, for instance, that some of Olé's weekly withholdings were authorized by J&W and therefore did not constitute a breach of contract, while others were not authorized and therefore *did* constitute a breach; such a conclusion is supported by at least some evidence indicating that, for a while and at first, J&W did not object to the withholdings, but later took a different position.

¶49 In any event, and regardless of whether this was what the jury was actually thinking, the jury's damages figure was supported by the evidence presented. Thus, under the circumstances, the trial court did not abuse its discretion in determining that the jury's damages award was sufficiently supported. We therefore affirm the trial court's order denying Olé's motion for a new trial.

## II. Attorney Fees

¶50 Next, Olé challenges the trial court's award of attorney fees to J&W, and this challenge also has two parts. First, Olé asserts that the Agreement does not provide for recovery of fees at all, and that there is no contractual basis for any fee award. Second, Olé contends that the trial court abused its discretion when it determined that J&W was the prevailing party. We agree with the trial court on both counts.

## A

¶51 J&W grounds its claim to entitlement to attorney fees in section 4.3 of the Agreement,[7] which contains three sentences and provides in its entirety as follows:

> **Section 4.3 <u>Governing Law</u>.** Except as may otherwise be provided by this Agreement, this Agreement, and all rights and obligations

---

7. In the trial court, it took J&W some time to land on section 4.3 as the provision it believed authorized an award of attorney fees. In its initial motion for fees, it invoked sections 2.2 and 2.4 of the Agreement. It raised section 4.3 for the first time in its reply brief in support of its motion. In light of this new argument, the trial court allowed Olé to submit a sur-reply memorandum addressing section 4.3. The trial court, after oral argument, grounded its fee ruling in section 4.3, and Olé does not assert, on appeal, that J&W waived or failed to preserve its argument relying on section 4.3.

> hereunder, including matters of construction, validity and performance, shall be governed in and by the internal law (and not the law of conflicts) of the State of Georgia, United States of America. *In any action at law or in equity to enforce or construe any provision under this Agreement, or in any appeals from any such action, the non-prevailing party in such action, as determined by the courts in a final judgment or decree, shall pay the prevailing party all costs, expenses, and actual attorney's fees incurred by the prevailing party.* The parties hereby consent to the jurisdiction of a competent court to adjudicate such matters in Gwinnett County, Georgia.

(Emphasis added.) J&W asserts that this section's second sentence (emphasized above) authorizes an award of attorney fees to the prevailing party in this case. Olé resists this assertion on three grounds, none of which we consider persuasive.

¶52 First, Olé asserts that section 4.3 "is a governing law provision that is entirely inapplicable" to this case. While section 4.3 does also concern itself with choice of law and jurisdiction,[8] its second sentence contains clear language authorizing an award of attorney fees to the prevailing party in litigation over the Agreement. Olé also overlooks the fact that the parties agreed, in section 4.7 of the Agreement, that "[a]ll headings contained in this Agreement are provided for ease of reference only and shall not be deemed to affect or otherwise limit the contents of this Agreement in any way whatsoever." This sentiment is consonant with Utah law, under which "contract headings are more

---

8. At no point did Olé attempt to invoke either the choice-of-law clause or the jurisdiction clause in section 4.3. And on appeal, Olé makes no effort to assert that Georgia law should govern the issues, or to contend that the answer to any legal question in the case would be different under Georgia law than under Utah law.

appropriately regarded as organizational tools than substantive contract provisions," especially where the language of the heading is at odds with the language of the paragraph it heads. *See McEwan v. Mountain Land Support Corp.*, 2005 UT App 240, ¶ 25, 116 P.3d 955. Where clear language within section 4.3 authorizes an award of attorney fees, that clear language cannot be superseded by contrary language in the section heading, or by the presence of other apparently unrelated provisions contained in the same section.

¶53 Second, Olé contends that this lawsuit was not an action "to enforce or construe any provision" under the Agreement, and therefore asserts that—even if section 4.3 contemplates an award of attorney fees—the language of the section doesn't apply here. We disagree. Olé filed this action to seek payment allegedly due pursuant to the terms of the Agreement, and it continued to maintain, up to and during trial, that its affirmative claim was for enforcement of the payment terms of the Agreement. Thus, Olé pursued its lawsuit in an effort "to enforce" the terms of the Agreement, and therefore the attorney fees provision of section 4.3 applies here.

¶54 Finally, Olé points out that J&W, during trial, took the position that there were multiple contracts that governed the parties' relationship, including but not limited to the Agreement, and that J&W has never shown that any other agreement between the parties contained any attorney fees provision. It argues therefrom that J&W has not demonstrated that this case was actually about the Agreement (which contains an attorney fees provision) as opposed to one of the other contracts (which apparently do not). We disagree. Certainly, Olé's affirmative claims were grounded in the Agreement. And even assuming that there *were* other agreements that played a role in determining the relative financial obligations of these parties to each other, J&W never contended that the Agreement played no role.

¶55 In this case, where Olé sued J&W to recover money it thought it was owed under the Agreement, the litigation in question was an action "to enforce" the payment provisions of the Agreement. Accordingly, the attorney fees provision contained in section 4.3 applies here, and it entitles "the prevailing party" to recover "all costs, expenses, and actual attorney's fees incurred" in litigating the case.

B

¶56 And that brings us to Olé's second argument: that J&W was not the prevailing party in this suit to enforce the terms of the Agreement. In this vein, Olé asserts that J&W recovered only $140,000 when it was seeking some $350,000, and therefore contends that J&W cannot be considered to have prevailed. Under the circumstances presented here, however, we discern no abuse of discretion in the trial court's prevailing-party determination.

¶57 Significant to the trial court's determination was its conclusion that, irrespective of whether J&W had prevailed on its counterclaim, it had certainly "successfully defended against Olé's claim that J&W breached" the Agreement. Olé sued J&W for nearly $500,000, that claim was based entirely on the Agreement, and J&W clearly prevailed on that claim. Thus, even if we assume, for purposes of this discussion, that J&W and Olé fought to something of a draw as concerns J&W's counterclaim (which, again, may or may not have been based on the Agreement), J&W unquestionably prevailed on the larger claim. In this situation, the trial court did not abuse its discretion by determining that J&W was the prevailing party.[9]

---

9. J&W asks that we also order that Olé pay J&W's reasonable attorney fees incurred on appeal. As a general matter, "when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal."

(continued…)

CONCLUSION

¶58    Accordingly, we discern no error in the trial court's decision to deny Olé's motion for a new trial. The jury's verdict can reasonably be read in a consistent manner, and evidence supported the jury's damages award. Furthermore, the trial court did not err in awarding attorney fees, pursuant to section 4.3 of the Agreement, to J&W as the prevailing party. We therefore affirm the trial court's judgment in all respects, and we remand the case only for the limited purpose of quantifying J&W's attorney fees incurred on appeal.

—————

OLIVER, Judge, authored the Opinion of the Court as to Footnote 4, in which TENNEY, J., joined:

¶59    I concur in the majority opinion and agree that the trial court correctly denied Olé's motion for a new trial and correctly awarded attorney fees to J&W. I write separately because I disagree with the recommendation in footnote 4 to stop pleading claims for breach of the implied covenant of good faith and fair dealing as a separate claim from breach of the contract. While I likewise acknowledge that there "exists some apparent tension" in the caselaw, I disagree with the suggestion that it would be "simpler and cleaner for litigants to abandon the practice of pleading claims for breach of the implied covenant separately from claims for breach of . . . the same contract." *See supra* note 4. Indeed, for the reasons listed below, I believe it would be the exact opposite—confusing and unclear—if parties failed to plead a

—————

*Tronson v. Eagar*, 2019 UT App 212, ¶ 39, 457 P.3d 407 (quotation simplified). Moreover, the attorney fee provision in question— section 4.3—specifically provides for recovery of fees incurred on appeal. We therefore find merit in J&W's request for appellate attorney fees, and grant that request.

separate claim for breach of the implied covenant of good faith and fair dealing and then sought recovery for such claim at trial.

¶60    First, as long as this court's statement in *Olympus Hills Shopping Center v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 457 n.12 (Utah Ct. App. 1994), *cert. denied*, 899 P.2d 1231 (Utah 1995), that "breach of the covenant of good faith and fair dealing is an independent cause of action" remains good law, the failure to plead it as a separate claim invites discovery disputes and dispositive motions about whether that failure is fatal to pursuing the claim at trial. Second, it would cause confusion at trial for all involved—the parties, the district judge, and the jury—because a claim for breach of the implied covenant is distinct from other claims for breach of the contract, as recognized by the separate model jury instructions for "breach of the contract," *see* Model Utah Jury Instructions 2d CV2115, and for "implied covenant of good faith and fair dealing," *see* Model Utah Jury Instructions 2d CV2119, https://legacy.utcourts.gov/muji/?cat=1&subcat=21 [https://perma.cc/CG7D-FEQS].

¶61    Therefore, I believe that parties and their counsel should continue to follow *Olympus Hills* and plead breach of the implied covenant of good faith and fair dealing as an independent claim.

—————